# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### NEWNAN DIVISION

| | |
|---|---|
| CESAR EDUARDO BASTIDAS PEREGRINA, JOSE LUIS MARTINEZ VASQUEZ, ALBERTO VAZQUEZ GARCIA, JESUS ABNERT HERNANDEZ NUNEZ, and SEBASTIAN GUTIERREZ HERNANDEZ, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| | Civil Action No. _____ |
| v. | |
| SL ALABAMA, LLC; GB2G, INC. d/b/a ALLSWELL; SPJ CONNECT, INC.; and YOUNGJIN LEE, individually. | Class Action Complaint |
| | JURY DEMAND |
| Defendants. | |

## CLASS ACTION COMPLAINT

## CLASS ACTION COMPLAINT

Plaintiffs Cesar Eduardo Bastidas Peregrina ("Plaintiff Bastidas"), Jose Luis Martinez Vasquez ("Plaintiff Martinez"), Alberto Vazquez Garcia ("Plaintiff Vazquez"), Jesus Abnert Hernandez Nunez ("Plaintiff Hernandez"), and Sebastian Gutierrez Hernandez ("Plaintiff Gutierrez") (collectively referred to as "Plaintiffs"), file this Class Action Complaint for damages and equitable relief against SL Alabama, LLC ("SL Alabama"), GB2G, Inc. d/b/a Allswell ("Allswell"), SPJ Connect, Inc. ("SPJ"), and Youngjin Lee ("Defendant Lee") (collectively referred to as "Defendants"), individually and on behalf of other similarly situated employees of Defendants.

## NATURE OF THE CASE

1.     This case involves labor trafficking, fraud, discrimination, breach of contract, and wage violations against foreign workers of Mexican ancestry and national origin who were exploited as part of an illegal scheme for cheap labor in SL Alabama's automotive parts production plant.

2.     Defendant SL Alabama associated with the recruitment agency Defendant SPJ, a staffing agency, its related company Defendant Allswell, and an individual, Defendant Younjin Lee, for the common purpose of recruiting Plaintiffs and other foreign professionals from Mexico under the "Trade NAFTA" or "TN"

2

program and housing them in Alabama so that they could provide labor for Defendants SL Alabama in the U.S.

3.     All Defendants knew that TN visas would not and could not be granted for the manual labor positions they wanted to fill on automotive assembly lines. Rather, TN visas are strictly regulated and available only to professional-level foreign workers with specialized education and experience who will come to the U.S. to work professional-level scientific and technical jobs.

4.     Defendants therefore hatched a scheme to recruit highly skilled Mexican engineers and technicians for non-existent professional-level positions that would qualify for the TN visa program.

5.     The plan was a bait and switch accomplished by fraud against the foreign workers and the U.S. government: hire the professional-level Mexican engineers and technicians for non-existent engineer and technician jobs; assist the engineers and technicians with securing the TN visas by submitting fraudulent documents to the U.S. government; and when the foreign workers arrive in the United States, switch the job to a manual labor job with lower and discriminatory pay and excessive mandatory work hours.

6.     Plaintiffs and other Mexican engineers and technicians were victims of this fraudulent scheme. They relied upon Defendants' misrepresentations, paid

3

money for fraudulently-obtained visas, spent money to travel to the U.S. Consulate for interviews, and moved from Mexico to the U.S. for jobs they reasonably believed qualified for the TN visa program and would utilize their specialized education, experience, and skill.

7.     Defendants abused the TN visa process by luring Plaintiffs and other similarly situated workers to the United States with promises of professional-level employment. Once in the United States, Defendant Youngjin Lee, who is an officer of both Allswell and SPJ, threatened Plaintiffs and other similarly situated workers with eviction and deportation because of the complaints that they raised regarding their fraudulent employment and pay. Defendants' misrepresentations and Defendant Lee's threats violated the forced labor and trafficking for forced labor provision of the Trafficking Victims Protection Act, 18 U.S.C. §§ 1589 and 1590 ("TVPA").

8.     Defendants' conduct violated the federal Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"), and the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-1 et seq. ("Georgia RICO").

9.     But not only were Plaintiffs and other similarly situated Mexican engineers defrauded with false promises of jobs that did not exist; once they started

working at SL Alabama, they were also subjected to race and national origin discrimination in violation of 42 U.S.C. § 1981 ("Section 1981"), and deprived of minimum and overtime wages required by the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq. ("FLSA").

10.    Plaintiffs, on behalf of the Recruitment Class (as defined below), seek:

      a.   Compensatory and trebled damages and attorney's fees and costs, against all Defendants for violations of the federal RICO and the Georgia RICO, and punitive damages under the Georgia RICO;

      b.   Consequential, incidental, and/or nominal damages for contract breaches by Defendant SL Alabama;

      c.   Compensatory and punitive damages and attorney's fees and costs against all Defendants for violations of the TVPA.

11.    Plaintiffs, on behalf of the Discrimination Class (as defined below), seek lost wages and benefits, front pay, compensatory and punitive damages, plus pre-judgment and post-judgment interest, and attorney's fees and costs, against Defendants SL Alabama and SPJ for Section 1981 violations.

12.    Plaintiffs and similarly situated TN visa holders also seek lost wages, liquidated damages, and attorney's fees and costs against Defendants SL Alabama,

Allswell, and SPJ for violations of the FLSA.

## THE PARTIES

13.     Plaintiffs and putative class members are citizens of Mexico, non-citizens of the United States, and Hispanic persons of Mexican ancestry and national origin.

14.     Plaintiffs came to the United States on TN visas to work for Defendants SL Alabama and SPJ.

15.     Plaintiff Bastidas is a resident of Mexico and worked for Defendants SL Alabama and SPJ.

16.     Plaintiff Martinez is a resident of Mexico and worked for Defendant SL Alabama and SPJ.

17.     Plaintiff Vazquez is a resident of Mexico and worked for Defendant SL Alabama and SPJ.

18.     Plaintiff Hernandez is a resident of Texas and worked for Defendant SL Alabama and SPJ.

19.     Plaintiff Gutierrez is a resident of Texas and worked for Defendant SL Alabama and SPJ.

20.     At all relevant times, each Plaintiff was a "person" with standing to sue within the meaning of the RICO, 18 U.S.C. § 1964(c), and the Georgia RICO,

O.C.G.A. § 16-14-6(b).

21.    At all relevant times, each Plaintiff was a party to an employment contract with Defendants SL Alabama and SPJ, either individually or under a theory of joint employment, within the meaning of 42 U.S.C. § 1981 and the common law.

22.    At all relevant times, each Plaintiffs are each an "individual who [was] a victim" of a violation of the TVPA.

23.    At all relevant times, each Plaintiff was an "employee" of Defendants SL Alabama and SPJ within the meaning of the FLSA.

24.    Defendant SL Alabama is an Alabama limited liability company with its principal place of business at 2481 Airport Blvd., Alexander City, Alabama.

25.    Defendant Allswell is a limited liability company with its principal place of business at 124 Big Horn Drive, Newnan, Georgia 30265.

26.    Defendant SPJ Connect, Inc. is a Georgia limited liability company with its principal place of business at 124 Big Horn Dr., Newnan, Georgia 30265.

27.    Defendant Youngjin Lee (also known as "Paul Lee"), an individual, resides in Newnan, Georgia.

28.    Defendant Lee is listed as SPJ's Chief Executive Officer ("CEO") and Allswell's Secretary in each company's business registration with the Georgia Secretary of State.

7

29.     Defendant Lee also held himself out as Allswell's "President" in verbal communications with TN visa workers, including Plaintiffs.

30.     At all relevant times, each Defendant was a "person" within the meaning of the federal RICO, in that it is an individual or an entity capable of holding a legal or beneficial interest in property, 18 U.S.C. § 1961(3), and Georgia RICO, O.C.G.A. § 16-14-4.

31.     At all relevant times, Defendants SL Alabama, SPJ, and Allswell each were an "employer" of Plaintiffs, either individually or under a theory of joint employment, within the meaning of the FLSA, 29 U.S.C. § 203(d).

32.     At all relevant times, Defendant Lee in his individual capacity was an "employer" of Plaintiffs within the meaning of the FLSA, 29 U.S.C. § 203(d), in that he held and exercised the authority to hire and fire employees, set and issue pay, and otherwise establish and control day-to-day working conditions for Plaintiffs.

33.     Defendants SL Alabama, Allswell, and SPJ are each engaged in commerce or in the production of goods for interstate commerce.

34.     Defendants SL Alabama, Allswell, and SPJ each have a gross volume of sales made or business done of not less than $500,000 per year.

35.     Defendants were a "venture" within the meaning of the TVPA, 18 U.S.C. § 1595(a).

36.   At all relevant times, each Defendant was a "perpetrator" of one or more violations of the TVPA, and SL Alabama knowingly benefited financially or by receiving anything of value from participation in a venture which SL Alabama know or should have known had engaged in forced labor and trafficking for forced labor.

## JOINT EMPLOYMENT ALLEGATIONS

37.   At all relevant times, SL Alabama, Allswell, and SPJ jointly employed Plaintiffs and other similarly situated Mexican engineers as non-exempt employees under the FLSA to work at the SL Alabama facility in Alexander City, Alabama.

38.   The job offer letters and Support Letters setting forth the terms and conditions of Plaintiffs' and other similarly situated workers' employment—though false—were on SL Alabama letterhead and were signed by SL Alabama President Daesig Choi.

39.   Plaintiffs and other similarly situated Mexican engineers received training, supervision, and/or direction regarding how to perform their job and information and directives concerning the terms and conditions of their employment from SL Alabama, Allswell, and SPJ.

40.   The SL Alabama supervisors who directed the Plaintiffs' work wore shirts with an SL Alabama logo.

41.    SL Alabama supervisors told the Plaintiffs which station to work at, instructed them on how to perform their job, and monitored and corrected their work.

42.    SPJ and Allswell retained control over the terms and conditions of Plaintiffs' housing and utilities.

43.    Plaintiffs and other similarly situated Mexican engineers paid for and received housing and utilities provided by Allswell and SPJ. Allswell and SPJ (through Youngjin Lee) instructed them on terms and conditions of their employment through Defendant Youngjin Lee and others, with SL Alabama retaining substantial control over the terms and conditions of their employment such that SL Alabama, Allswell, and SPJ were all "joint employers."

## JURISDICTION AND VENUE

44.    This Court has subject matter jurisdiction over the federal claims in this case pursuant to 28 U.S.C. § 1331.

45.    Pursuant to 28 U.S.C. § 1367, the Court has pendent jurisdiction over Plaintiffs' state law claims because they are part of the same case or controversy as their federal claims.

46.    The Court has personal jurisdiction over Defendants Allswell, SPJ, and Youngjin Lee because they reside in and conduct systematic and continuous activity in this District, including activity giving rise to Plaintiffs' and other similarly

situated workers' causes of action.

47.    The Court has personal jurisdiction over SL Alabama because it conducts systematic and continuous activity in this District, including

      a.  By jointly employing, along with Allswell, SPJ, and Defendant Lee, Plaintiffs and other similarly situated engineers;

      b.  By participating in a venture in this District with Allswell, SPJ, and Youngjin Lee to recruit, transport, provide, and obtain Plaintiffs' and other similarly situated Mexican engineers' forced labor; and

      c.  By associating with Allswell, SPJ, and Youngji Lee as a RICO enterprise and committing a pattern of racketeering activity through that enterprise, as alleged below.

48.    Venue is proper in this Court because all Defendants either reside, are found, have agents, or transact their affairs (including but not limited to the RICO Enterprise and pattern of racketeering activity alleged below) in this District and the ends of justice require that all Defendants be brought before the Court under RICO, 18 U.S.C. §§ 1965 (a), (b), and (d).

11

## STATEMENT OF FACTS

### *The TN visa Program*

49.    The North American Free Trade Agreement ("NAFTA"), which came into force on January 1, 1994, created a special trade relationship between the United States, Mexico, and Canada. *See generally,* North American Free Trade Agreement, Can.-Mex.-U.S., Dec. 17, 1992, 32 I.L.M 289 (1993).

50.    The U.S. government created the TN nonimmigrant classification, commonly known as the TN visa, to permit Mexican and Canadian professionals in certain occupations ("TN profession") to temporarily enter the U.S. for employment within their profession. *See* 8 C.F.R. § 214.6(a).

51.    Engineer and Scientific Technician/Technologist are among the categories of professionals permitted entry into the United States with TN visas. *See* 8 C.F.R. § 216.4(c) (incorporating Appendix 1603.D.1 to Annex 1603 of the NAFTA).

52.    A Mexican citizen applying for a TN visa:

must present documentation sufficient to satisfy the consular officer … that the applicant is seeking entry to the United States to engage in business activities for a United States employer(s) or entity(ies) at a professional level, and that the applicant meets the criteria to perform at such a professional level. This documentation may be in the form of a letter from the prospective employer(s) in the United States or from the foreign employer, and must be supported by diplomas, degrees or

membership in a professional organization…The documentation shall fully affirm:

(A) The [TN] profession of the applicant;

(B) A description of the professional activities, including a brief summary of daily job duties, if appropriate, in which the applicant will engage in for the United States employer/entity;

(C) The anticipated length of stay;

(D) The educational qualifications or appropriate credentials which demonstrate that the … Mexican citizen has professional level status; and

(E) The arrangements for remuneration for services to be rendered.

8 C.F.R. § 214.6(d)(3)(ii).

53.     The TN visa applicant "must engage in a prearranged business activity at a professional level for a U.S. or foreign employer." 9 F.A.M. § 402.17-5(A).

54.     Once an applicant has provided the required evidence set forth in the preceding paragraph, the applicant is admitted under the TN visa classification for a period of up to three years. *See* 8 C.F.R. § 214.6(e).

55.     The TN visa is tied to the associated employer for the duration of the TN visa period unless a new employer submits a verified petition to USCIS seeking to add or change employers. 8 C.F.R. § 214.6(i)(1) (the new employer must file a Form I-129, Petition for Nonimmigrant Worker).

56.     Since 1997, the number of TN visas issued has increased significantly every year, except for 2020 due to the COVID-19 pandemic. For example, in 1997, 287 TN visas were issued to Mexican nationals.[1] By 2007, the number had increased to 4,060.[2] In 2017, it had grown to 15,993 visas.[3] In 2021, 24,881 TN visas were issued to Mexican nationals.[4]

57.     Government oversight of TN visa holders' working conditions in the United States is limited. As a consequence, there have been multiple reports of

_____

[1] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 1998), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY1998_NIV_Detail_Table.pdf (last viewed Nov. 4, 2022).

[2] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 2007), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY07NIVDetailTable.pdf (last viewed Nov. 4, 2022).

[3] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 2017), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY17NIVDetailTable.pdf (last viewed Nov. 4, 2022).

[4] *See* Nonimmigrant Visas Issuances by Visa Class and Nationality, U.S. Department of State (FY 2021), https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY21NIVDetailTable.pdf (last viewed Nov. 4, 2022).

abuses—including misrepresentations in employment contracts—of TN workers,[5] as well as several lawsuits.[6]

### *Defendants' Fraudulent Scheme*

58.    The fraudulent acts described herein were committed by Defendants through a RICO Enterprise, as described below.

### <u>SL Alabama</u>

59.    SL Alabama is a subsidiary of SL Corporation, a South Korean company which has manufactured automotive products for decades, and now does so in three North American locations including Tennessee, Alabama, and Michigan. *See* About, https://www.sl-america.com/about/ (last visited Oct. 25, 2023).

60.    SL Alabama was established in 2003 and is a large manufacturer of headlights, rear combination lights, and side mirrors for automobile manufacturing companies Hyundai and Kia. *See* Alabama, https://www.sl-america.com/locations/us-locations/alabama/ (last visited Oct. 25, 2023).

---

[5] Coerced under NAFTA: Abuses of Migrant Workers in the TN visa Program and Recommendations for Reform, Centro de los Derechos del Migrante (Dec. 2017), https://cdmigrante.org/wp-content/uploads/2018/01/Coerced-under-NAFTA_-Abuses-of-Migrant-Workers-in-TN-Visa-Program.pdf (last viewed March 25, 2022).
[6] *See, e.g., Martinez-Rodriguez v. Giles*, 31 F.4th 1139 (9th Cir. 2022); *Castellanos v. Wordlwide Distribution Sys. USA, LLC,* No. 2:14-CV-12609, 2016 WL 11678220, at *8 (E.D. Mich. June 20, 2016).

61.    SL Alabama employs approximately 650 employees in the Alexander City, Alabama area. *Id.*

62.    SL Alabama uses outside labor recruiters, including SPJ Connect, to staff the Alexander City facility.

63.    In August 2022, an investigation by the U.S. Department of Labor found that SL Alabama employed child workers at the facility, *see Hyundai supplier accused of child labor violations by U.S. authorities*, Reuters, Aug. 22, 2022, *available at* https://www.reuters.com/legal/hyundai-supplier-accused-child-labor-violations-by-us-authorities-2022-08-23/ (last visited Oct. 25, 2023).

64.    SL Alabama claimed that the child workers had been hired by "an outside labor recruitment firm." *Id.*

65.    The U.S. Department of Labor brought a civil action in the U.S. District Court for the Middle District of Alabama, No. 3:22-CV-00507, alleging that SL Alabama had repeatedly employed child workers in violation of federal law since November 29, 2021. *See* Doc. 1, No. 3:22-CV-00507-CWB (M.D. Ala. 2022).

66.    SL Alabama entered into a consent judgment on September 29, 2022 which required it to, among other things, provide training materials to employees, subcontractors, and other entities providing SL Alabama with workers for the Alexander City site to ensure compliance with labor standards. *See* U.S. Dep't of

Labor, News Release, *Federal Court orders Hyundai, Kia Auto Parts Manufacturer to Stop Employing Minors Illegally, End 'Oppressive' Child Labor Law Violations*, *available at* https://www.dol.gov/newsroom/releases/WHD/WHD20221011 (last visited Oct. 25, 2023).

67.    During the same time, as detailed *infra*, SL Alabama was also utilizing outside labor recruiters SPJ and Youngjin Lee to fraudulently induce Plaintiffs and other similar situated Mexican engineers and skilled technologists to take jobs as manual laborers in the Alexander City facility.

68.    SL Alabama also utilized Allswell, SPJ, and Youngjin Lee to provide supervision and direction to Plaintiffs and other similarly situated Mexican engineers regarding their work at the SL Alabama facility; to provide housing, utilities, and information and direction regarding the terms and conditions of their employment in the SL Alabama facility; and to obtain Plaintiffs' labor through abuse of legal process, threats of abuse of legal process, and threats of serious harm.

## Allswell, SPJ, and Youngjin Lee

69.    SPJ is a labor recruiter based in Hogansville, Georgia and with offices in Mexico.

70.    SPJ served as the first point of contact for Plaintiffs and other similarly situated employees in Mexico who were hired by SL Alabama to work at its plant.

17

71.     SPJ regularly advertises new job vacancies for TN visa jobs on the internet, including on LinkedIn and Facebook.

72.     Indeed, as recent as July 2023, SPJ posted on Facebook about having its lawyers help workers with TN visa procedures.

73.     On LinkedIn, SPJ promotes itself as being a "trilingual law firm that assists US companies recruit highly skilled workers via the TN Visa Process." *See* https://www.linkedin.com/company/spj-connect/ (last viewed Dec. 16, 2022).

74.     SPJ claims that its "goal is to help our US clients save time and money by providing all the support needed to get a TN Visa Approval for all of their candidates." *Id.*

75.     SPJ executive Yadira Leos stated that the company has roughly 500 vacancies to fill every month.

76.     Allswell is a staffing company that provides laborers to work at other companies, including Hyundai and Kia.

77.     Allswell claims to be an "engineer staffing solution." *See* Allswell Engineering Staffing Solutions, https://allswellproducts.com (last visited Oct. 23, 2023).  Its website states that it provides professional staffing services, recruitment, and TN visa legal assistance. https://allswellproducts.com/en/services/ (last visited Oct. 23, 2023).

78.     Defendant SPJ advertised job opportunities with Defendants SL Alabama at multiple universities and other locations in Mexico.

79.     Allswell began operations as a staffing company in Georgia in approximately October 2016.

80.     By June 2020, Allswell started operations to seek Mexican workers for employment in the United States through the TN visa program.

81.     By October 2020, Allswell began employing TN visa candidates for non-technical work in the U.S. automotive industry.

82.     As of October 2022, Allswell had over 500 TN visa holders employed at different companies in the U.S., entirely or almost entirely in the Deep South.

83.     Allswell's website explains that it helps to secure legal services to help its job applicants obtain TN visas.

84.     SPJ and Allswell both promote their services on Facebook and other social media, claiming they can help workers "fulfill [their] dream of working legally in the United States."

85.     SPJ and Allswell work together; SPJ assists Mexican nationals with preparing and submitting TN visa applications for high-skilled jobs to the U.S. Government to gain authorization for those individuals to come to the U.S. and work

for Allswell. Allswell, in turn, provides housing and utilities to these highly skilled TN visa holders working at Defendant SL Alabama.

86.    SPJ and Allswell brought hundreds of Mexican nationals to the United States to work at the SL Alabama plant in Alabama, through their coordinated effort as described *supra* and *infra*.

87.    In their business registrations with the Georgia Secretary of State, SPJ and Allswell share the same registered agent address, which is a residential home located in Newnan, Georgia.

88.    Defendant Youngjin Lee is listed as the Chief Executive Officer for SPJ and as the Secretary for Allswell on the Georgia Secretary of State's Corporations Division website.

89.    Youngjin "Paul" Lee also held himself out as the President of Allswell to TN visa holders, including Plaintiffs and other similarly situated employees who worked at SL Alabama.

90.    Mr. Lee directed Julian and Hector to collect rent from the Plaintiffs and other TN visa workers. (Exhibit 1).

91.    Once Plaintiffs and other similarly situated TN visa workers arrived in the U.S., they were required to live and pay rent in an apartment for which Allswell held the lease. When they tried to move out of the apartments, they were told by the

apartment building official that they needed the permission of Allswell to move out.

92.   Allswell and SPJ maintained the utility accounts for the apartments in which Plaintiffs and other similarly situated TN visa workers lived. Initially, Plaintiffs and other similarly situated TN visa workers received their utility bills from Allswell directly and paid the money to Allswell.

93.   On July 21, 2021, SPJ Accounting Manager Brian Park contacted some of the Plaintiffs and TN Visa workers at SL Alabama via WhatsApp and explained that they would be responsible for paying Allswell's electricity bill directly to the City of Alexandria. (Exhibit 2).

### *Plaintiff Cesar Eduardo Bastidas Peregrina*

94.   Mr. Bastidas was born and raised in Mexico, is a citizen of Mexico, and is not a citizen of the United States.

95.   Mr. Bastidas is a skilled technician and engineer.

96.   He graduated from the Universidad Politecnica de Aguascalientes in Mexico and earned a bachelor's degree in industrial engineering.

97.   He has over three years of engineering experience.

98.   On or around February 2021, Mr. Bastidas found out about a potential job at SL Alabama from a family member who saw a job posting on a flyer. Mr. Bastidas subsequently contacted SPJ about the job.

99.    On February 22, 2021, SPJ employee or agent Julia Vega emailed Mr. Bastidas on behalf of SPJ requesting various documents, including his professional degrees, current passport, driver's license, medical information, and resume.

100.    Mr. Bastidas sent Ms. Vega the documents requested.

101.    SPJ interviewed Mr. Basidas for a job with with SL Alabama.

102.    After the interview, on March 5, 2021, SPJ employee or agent Jesus Baez sent Mr. Bastidas, on behalf of SPJ, a copy of an offer letter from SL Alabama that was dated March 3, 2021.

103.    In the email, Mr. Baez wrote: "Hard work and dedication will always pay off for people who pursue their dreams just like you. Few of us are fortunate enough to have this kind of opportunity during the pandemic with the lack of work we are experiencing in our country. Attached you will find your job offer letter from the company SL America. Please, read it in detail, and feel free to reach out to us if you have any questions. We will gladly support you. If you have no doubts, please sign the letter, scan it, and send it back to us." The letter further gave Mr. Bastidas 24 hours to inform SPJ regarding whether he was accepting the job offer.

104.    The offer letter was on SL Alabama letterhead, was addressed to Mr. Bastidas, and offered him the job of Production Technician at the SL Alabama plant. (Exhibit 3).

22

105. The offer letter stated, among other things, that:

    a. His job title was production technician;

    b. His yearly compensation was $32,000;

    c. His hourly wage rate was $11.00 per hour plus overtime;

    d. Other benefits included 8 weeks of housing and transportation, and health insurance would be paid 70% by the company.  *Id.*

106. This offer letter was signed by an official at SL Alabama.  *Id.*

107. Mr. Bastidas signed the agreement on March 5, 2021, indicating he understood and agreed to the terms of the job offer. *Id.* He emailed it back to Mr. Baez at SPJ.

108. On March 7, 2021, Joran Morales from SPJ emailed Mr. Bastidas with additional information about the TN visa application fee.

109. On March 8, 2021, Joram Morales from SPJ sent Mr. Bastidas an email with the subject line: "PRINT AND DO WHAT IS INDICATED." The email contained three attachments: (1) a new offer letter dated March 8, 2021 with an increased salary; (2) a Support Letter; and (3) a guide regarding the interview process.

110. The new offer letter dated March 8, 2021 was on SL Alabama letterhead and addressed to Mr. Bastidas and offered him a job as a production technician at

SL Alabama. It stated that the employment period would be up to three years and his annual salary would be $42,000 for "full time." (Exhibit 4).

111.   The March 8, 2021 offer letter further stated: "We are satisfied with your academic background and professional knowledge. We believe you will be a valuable asset to the growth of this company's business in the U.S." *Id.*

112.   Mr. Bastidas signed the offer letter and returned it to SPJ.

113.   The second offer letter replaced and discharged the initial offer letter.

114.   A few days before Mr. Bastidas' interview at the embassy, Gloria Gamez from SPJ contacted Mr. Bastidas on the phone and explained to him that he should only provide the new "updated" offer letter with the higher salary to the embassy when he went there for his TN visa interview.

115.   To secure Mr. Bastidas a TN visa so he could come to work in the United States at the SL Alabama plant, SL Alabama prepared and SPJ sent Mr. Bastidas a TN visa Support Letter pursuant to 8 C.F.R. 214.6(D)(3), dated March 8, 2021, which was addressed to the United States Consulate in Mexico.  (Exhibit 5).

116.   The Support Letter was on SL Alabama letterhead, signed by SL Alabama President Daesig Choi, and the metadata of the Microsoft Word version of the document sent to Mr. Bastidas shows that the author of the document was SL Alabama.

117.   The letter stated that the business conducted by SL Alabama "shall be carried out in accordance with the laws and regulations of the respective countries and respect the customs of the trade." *Id.,* p. 1).

118.   The Support Letter stated, among other things, that Mr. Bastidas was being offered a job as a production technician where he would "utilize his academic background in industrial engineering and professional experiences in the field of Production to support the company in the development, analysis, improvement, and implementation of process definition and control procedures, management, of the flow of materials and equipment specifications, and process yield capabilities to help improve the efficiencies." *Id.,* page 2.

119.   The Support Letter further stated that his "main job duties" would include the following:

  a. Provide technical support to improve operations processes;

  b. Utilize a sequential flow pattern in the process;

  c. Minimize backtracking of work in the process;

  d. Implement a predictable process;

  e. Analyze, develop, and optimize workflows within the production process across all departments to improve efficiency throughout the company;

f.     Provide technical support to improve company operations and eliminate waste;

g.     Develop best practices, routines, and innovate new solutions to improve production rates and overall part quality;

h.     Work closely with Quality team to create, improve, and develop standardized work instructions;

i.     Develop and implement activity plans for projects;

j.     Confer with other staff regarding manufacturing capabilities, production schedules, and other considerations to facilitate production processes and reduce costs. *Id.*

120. The Support Letter from SL Alabama further explained that Mr. Bastidas was qualified for the TN visa job because, among other things, he had over three years of engineering experienced and the "required knowledge and sophistication that would enable him to comprehend complex engineering concepts and scientific theoretical principles." *Id.*

121. The Support Letter further proposed to hire Mr. Bastidas for a temporary three-year period and stated it would compensate him "$42,000 per year plus a standard package of employee benefits including 8 weeks of housing and transportation." *Id.*, p. 3.

26

122.   Although unknown to Mr. Bastidas, the required job qualifications and the position description provided in the job offer and Support Letter to secure the TN visa were false.

123.   At the time Mr. Choi signed the Support Letter, he knew the representations about the job qualifications and the job description were false.

124.   Unknown to Mr. Bastidas, he was the victim of a scheme to abuse the legal TN visa process for the purpose of providing and obtaining his employment for manual (non-technical) production line work at SL Alabama.

125.   In anticipation of Mr. Bastidas' TN visa interview with the consulate, SPJ also sent him a six-page guide from a "Mexican Lawyer" which outlined the documents he should bring to the consulate, the types of questions he might be asked, and suggested answers. (Exhibit 6).

126.   The TN visa Interview Guide advised Mr. Bastidas to "PLEASE BE READY TO ANSWER QUESTIONS ABOUT THE LETTER OF SUPPORT "SUPPORT LETTER." *Id.*

127.   The guide further emphasizes that only certain documents should be brought to the TN visa interview. SPJ specifically directed Mr. Bastidas to only bring the copy of the job offer "that comes in the package of documents received by DHL." It further wrote: "NOTE: FOR ANY REASON YOU MUST NOT TAKE WITH

YOU THE 'JOB OFFER' THAT YOU RECEIVED IN YOUR MAIL FROM THE COMPANY, since this is only an internal format of the company, and IS NOT USEFUL for the consulate since another format is used, which is the one you receive in original. *Id.*

128.   The guide further directed Mr. Bastidas to "study everything and prepare to answer in English, you must make a sheet with the questionnaire of questions and answers in both languages so that you can study them and send it to me to check that you did it well." *Id.*

129.   The instructions further list "possible questions and suggested answers," including some of the following:

    a.    "What are your job activities to be performed? A[nswer]: (Here you answer the ones that come in your support letter in the part that says: "His main job duties including the following")".

    b.    "Describe how your studies and career are compatible for the employer in the United States A: BECAUSE I HAVE EXPERIENCE IN THAT, THAT'S WHAT I DO HERE IN MEXICO…"

    c.    "Where will the job be performed? A: Management of the company."

d.    "What are the salary terms? R: **Annual salary $_____ dollars plus benefits (housing and transportation."**

e.    "What do you do here in Mexico? What are your activities in your current job? IN THIS ANSWER YOU MUST MAKE IT CLEAR TO THE CONSULATE [SIC] THAT WHAT YOU DO IN YOUR CURENT JOB IS THE SAME AS WHAT YOU ARE GOING TO DO IN THE COMPANY THAT IS HIRING YOU."

f.    "Who is going to supervise you in the company? A qualified engineer will be supervising me." *Id.*

130.   Gloria Gamez from SPJ also called Mr. Bastidas and had a practice interview with him on the phone. She asked him practice questions and told Mr. Bastidas to emphasize in his interview that he plans on returning to Mexico, and to tell the interviewer that he would be an engineer.

131.   In March 2021, Mr. Bastidas travelled to the U.S. Consulate in Mexico City for an interview to obtain a TN visa.

132.   Mr. Bastidas incurred travel and food costs which were not reimbursed.

133.   Mr. Bastidas paid $160 to apply for the TN visa. This cost also was not reimbursed.

134.   The scheme by Defendants to fraudulently secure a TN visa for Mr.

29

Bastidas was successful and, in reliance on the misrepresentations in the Support Letter, the U.S. government granted a TN visa for Mr. Bastidas to work on a temporary basis in the United States at SL Alabama.

135.   On or around April 2021, in reliance on the promises made by SPJ and SL Alabama concerning the job promised to him in the Support Letter and his eligibility for that job under U.S. law, Mr. Bastidas moved from Mexico to the United States to begin work at the SL Alabama plant in Alabama.

136.   SPJ instructed him to cross the border on land. As a result, and to travel to Alabama, he paid for a hotel and airfare.

137.   After arriving at the airport in the United States, Mr. Bastidas was picked up by two Mexican workers, Julian and Hector, who represented that they worked for SPJ. He was abruptly told by them that the real job he was required to perform was a manual labor job and "if you don't like it you can go back to Mexico with your own money."

138.   Mr. Bastidas was subsequently taken to an apartment complex in Alabama and directed by Allswell and SPJ to live there with three other TN visa workers.

139.   In early April 2021, Mr. Bastidas started working for SPJ and SL Alabama.

140. When Mr. Bastidas began the job, he had already expended significant costs and expenses to travel to the United States, and he had foregone other employment opportunities.

141. Mr. Bastidas immediately learned that the job he had been promised did not exist (or at least did not exist for him). Rather than perform skilled technical services as promised by SPJ and SL Alabama and as required for a TN visa, Mr. Bastidas was required to perform manual labor on a production line.

142. The production line work required no technical skill and involved the repetitive installation of headlights. Mr. Bastidas repetitively connected wires and put screws into the headlights. He engaged in repetitive hand motions for twelve-hour shifts to perform the job.

143. Mr. Bastidas performed strenuous and physically demanding work. As a result, his back, legs, and hands hurt.

144. The first three weeks, SPJ and Allswell required that he work seven days a week. The first time he was given a day off, he hugged the line lead because he was so happy that he could rest.

145. SPJ and SL Alabama discriminated against Mr. Bastidas during his employment.

146. While Mr. Bastidas was required to work overtime under threat of

termination and deportation, other SL Alabama employees who were U.S. citizens or nationals, non-Mexican nationals, and/or non-Hispanic were only required to work 40 hours per week without threat of termination.

147. During Mr. Bastidas' employment, he was paid approximately $11 per hour.

148. Mr. Bastidas worked alongside employees of SPJ and SL Alabama and was supervised and received instruction on how to perform his job from SL Alabama supervisors.

149. The SL Alabama supervisors directing Mr. Bastidas' work wore shirts with an SL Alabama logo.

150. Mr. Bastidas was also required to work overtime. He worked 12-hour shifts and six-day workweeks.

151. Although he asked his SL Alabama supervisor if it was possible to work fewer hours or days, he was told his work schedule and the overtime were mandatory.

152. Mr. Bastidas has advanced English skills and frequently served as an interpreter between English speaking employees/supervisors and TN visa workers.

153. Mr. Bastidas, speaking for himself and his co-workers, communicated with SPJ employees Julian and Hector about his and his co-workers' frustration with

the work. He shared that and he was going to contact lawyers to find out if this scheme was legal. He said they were lied to about the nature of the job and the terms and conditions of their employment. Mr. Bastidas also complained that he and his co-workers were promised transportation in the offer letters, but SPJ would only drive them to the grocery store once every two weeks and packed the TN visa workers into a van like sardines.

154.   Mr. Bastidas frequently complained to Julian and Hector about the work hours, the treatment he experienced, and the nature of the job and fraud that was taking place.

155.   After Mr. Bastidas and other TN visa workers at SL Alabama frequently complained about the hours they were working performing manual labor and the low wages they were being paid, they were called into a meeting with SPJ and Allswell and SPJ President Youngjin Lee at one of the apartment units at the complex in which they were directed to live.

156.   Mr. Lee yelled at Mr. Bastidas and the other TN visa workers and expressed anger and irritation. He yelled that he had provided these workers with an opportunity and they had to accept it – and if they did not accept it, they would be fired and immigration officials would be notified.

157.   Mr. Lee also threatened Mr. Bastidas and other TN visa workers by

stating that if anyone left the job, Mr. Lee would notify federal immigration authorities so that the TN visa could be taken away from them and they would be deported. He further intimidated the workers by stating that he knew where they all lived in case they "did anything more"—which Mr. Bastidas understood to mean if a complaint or lawsuit was filed.

158.   Mr. Lee also told Mr. Bastidas if he kept his mouth shut, he could have been a manager and questioned why Mr. Bastidas and other workers were complaining because Mr. Lee believed he was helping the workers.

159.   In front of the other TN visa workers, Mr. Lee proceeded to fire Mr. Bastidas for being outspoken with his complaints. Mr. Lee pointed at Mr. Bastidas and two other TN visa workers and said in summary: "I don't want you here. You're complaining a lot. You're making other workers unhappy. I want your stuff out of the apartment today and you shouldn't go to work at SL Alabama tomorrow." In response, Mr. Bastidas started shaking and crying because he understood he would be destitute, homeless, without a visa, and subject to deportation. Mr. Lee then rescinded the termination indicating Mr. Bastidas was rehired but he must stop complaining.

160.   Mr. Lee threatened Mr. Bastidas with eviction, termination (and, based on Mr. Lee's earlier explanation, deportation as a consequence of the termination)

in front of the other TN visa workers to prevent them from complaining, seeking advice about their legal rights, or seeking legitimate employment.

161.   Throughout Mr. Bastidas' employment, he lived with three TN visa worker roommates in a two-bedroom apartment that was leased by Allswell. Mr. Bastidas and his roommates had to pay $600 each per month to Allswell for rent. They were also responsible for paying utilities after the initial 8 week period when Allswell paid their utilities.

162.   As outlined above, Mr. Bastidas was not permitted to perform the technical services he was hired to perform or that used the job skills that SPJ and SL Alabama told Mr. Bastidas and the U.S. government were necessary for the position.

163.   Sometime between Thanksgiving and Christmas in 2021, Mr. Bastidas reached his breaking point, quit his job, and returned to Mexico at his own expense. He determined he would rather bear the costs and risks of leaving than continue working (a) excessive mandatory overtime, (b) in poor working conditions at a manual labor position that was contrary to what he had been promised (c) for lower pay than he was promised, and (d) under threat of eviction and deportation if he complained.

164.   He has since sought therapy for the impact that the fraud, threats, and working conditions had on his mental health.

165.   In November or December 2021, approximately eight new TN visa workers arrived to work for SL Alabama.

### Plaintiff Jose Luis Martinez Vasquez

166.   Mr. Martinez was born and raised in Mexico, is a citizen of Mexico, and is not a citizen of the United States.

167.   He is a skilled technician and engineer.

168.   Mr. Martinez graduated from the Universidad Tecnologica de Coahuila in 2020.

169.   He has completed the curriculum for Machines and Tools Technicians from El Colegio Nacional de Educación Profesional Técnica in Mexico.

170.   In November 2020, Mr. Martinez was introduced to Defendants' fraudulent scheme through SPJ's Facebook page, and he applied for an engineering job online through SPJ.

171.   Mr. Martinez applied for an engineering job posted by SPJ in hopes of being able to come to the United States to expand his skills and earn a better living.

172.   In November 2020, SPJ provided him with a Support Letter from Allswell and offered him the job of maintenance engineer at Hyundai Mobis.

173.   However, his TN visa was not approved after he interviewed at the consulate for this position.

174.   In 2021, SPJ contacted Mr. Martinez again and advised him about the opportunity at SL Alabama.

175.   Mr. Martinez spoke to Yadira Leos from SPJ about the job at SL Alabama, which she explained was a scientific technician job.

176.   In or about March 2021, SPJ coordinated an interview for Mr. Martinez, which was to take place over a Zoom call with a Korean man from SL Alabama named Kim.

177.   During the interview, Kim asked Mr. Martinez about his work experience, what he studied, and why he wanted to work in the United States.

178.   Kim further explained that he was interviewing for a science technician job, and there was a vacancy for this position.

179.   During the Zoom interview, Kim never gave any indication that Mr. Martinez would be hired for anything other than a qualified, technically skilled science technician position pursuant to a TN visa.

180.   Mr. Martinez was never told that the job for which he applied was a manual labor position on a production line.

181.   After the interview, SPJ sent Mr. Martinez a letter on SL Alabama letterhead, signed by SL Alabama President Daesig Choi, and dated March 26, 2021, offering him a job as Production Technician at SL Alabama. (Exhibit 7).

37

182.    The offer letter stated, among other things, that:

    a.    Mr. Martinez was being offered the job of production technician;

    b.    The yearly compensation would be $32,000 and the hourly wage rate was $11.00 per hour plus overtime.

    c.    Other benefits included 8 weeks of housing and transportation and health insurance paid 70% by the company. *Id.*

183.    Plaintiff Martinez signed the offer letter on March 29, 2021 indicating he agreed and accepted the terms and conditions of the job offer. He emailed the signed offer letter to Jesus Baez at SPJ on March 29, 2021. *Id.*

184.    SPJ continued to coordinate Mr. Martinez's employment with SL Alabama by providing information and directives relating to his TN visa application.

185.    SPJ subsequently sent him a second offer letter with a higher salary. SPJ further instructed Mr. Martinez to show the second offer letter to the officials at the embassy when he attended his TN visa interview.

186.    SPJ explained to Mr. Martinez that the second offer letter would better assist him with getting a TN visa when he went for his interview.

187.    The second offer letter replaced and discharged the initial offer letter.

188.    In an effort to get Mr. Martinez a TN visa so he could come to work in the United States, SPJ and SL Alabama prepared a Support Letter to the U.S.

Consulate pursuant to 8 C.F.R. 214.6(d)(3), which was presented to the consulate as part of a required submission for Mr. Martinez's TN visa application. (Exhibit 8).

189.  SPJ provided the Support Letter to Mr. Martinez for inclusion with his TN visa application.

190.  SPJ prepared Mr. Martinez for the TN visa interview by providing him with a document outlining the types of questions he might be asked, and the types of answers he should give.

191.  SPJ further directed Mr. Martinez not to say at any point that he would be planning to stay in the United States because it was explained that the visa would be denied if that was shared during the interview. Mr. Martinez had no plans of doing that and made no such representation during his interview.

192.  In anticipation of Mr. Martinez's TN visa interview with the U.S. Consulate, SPJ told him which documents to bring with him to the interview, including the Support Letter.

193.  The Support Letter SPJ provided to Mr. Martinez was (a) dated April 2, 2021 (b) addressed to the United States Consulate in Mexico City, (c) on SL Alabama letterhead, and (d) signed by SL Alabama President Daesig Choi. (Exhibit 8).

194.  SL Alabama wrote that the job requires a "Scientific Technician in the

Production services division. The challenges presented by the technical nature of our target markets, require the services of an individual who has the necessary academic background and specialized experience in the manufacturing industry." *Id.,* p. 2.

195.  SL Alabama stated that the Scientific Technician job that would be performed by Mr. Martinez would include the following job duties:

     a.    Provide technical support to improve operations processes;

     b.    Utilize a sequential flow pattern in the process;

     c.    Minimize backtracking of work in the process;

     d.    Implement a predictable process;

     e.    Analyze, develop, and optimize workflows within the production process across all departments to improve efficiency throughout the entire company;

     f.    Provide technical support to improve company operations and eliminate waste;

     g.    Develop best practices, routines and innovate new solutions to improve production rates and overall part quality;

     h.    Work closely with the quality team to create, improve, and develop standardized work instructions;

     i.    Develop and implement activity plans for projects; and

j.     Confer with other staff regarding manufacturing capabilities, production schedules, and other considerations to facilitate production processes and reduce costs. *Id.,* pp. 3-4.

196. SL Alabama also ensured that this Scientific Technician "will be directly supervised by a licensed Engineer provided by SL ALABAMA LLC and will also provide technical translators on-site…" *Id.*

197. SL Alabama further explained that Mr. Martinez's academic background and experience qualified him for the position and detailed his extensive professional experience. *Id.,* p. 4.

198. The Support Letter proposed to hire Mr. Martinez for a three-year period and stated it would compensate him at $42,000 per year "plus a standard package of employee benefits including 8 weeks of housing and transportation." *Id.,* p. 4.

199. Although unknown to Mr. Martinez, the required job qualifications and position description provided in the job offer and Support Letter to secure the TN visa were false.

200. At the time Mr. Choi signed the Support Letter, he knew the representations about the job qualifications and the job description were false.

201. Also unknown to Mr. Martinez, he was the victim of a scheme to secure

his employment for manual (non-technical) production line work at SL Alabama.

202.   The following week, Mr. Martinez traveled to the U.S. Embassy in Mexico City for an interview to obtain a TN visa.

203.   Mr. Martinez incurred travel and food costs which were not reimbursed.

204.   Mr. Martinez paid $160 to apply for the TN visa. This cost was also not reimbursed.

205.   Mr. Martinez sold his personal items, such as video games, stereos, and cell phones, so that he could pay for the visa and associated travel costs.

206.   The scheme by Defendants to fraudulently secure a TN visa for Mr. Martinez was successful; in reliance on the misrepresentations SPJ and SL Alabama made in the Support Letter, the U.S. government issued Mr. Martinez a TN visa to work on a temporary basis in the United States at SL Alabama.

207.   On April 19, 2021, Gloria Gamez from SPJ emailed Mr. Martinez congratulating him for obtaining his work (TN) visa and requested a physical copy of the same.

208.   In reliance on the promises made by SPJ and SL Alabama concerning the job promised to him in the Support Letter and his eligibility for that job under U.S. law, Mr. Martinez moved from Mexico to Alabama.

209.   On or around April 26, 2020, Mr. Martinez travelled to the United

States. He was only partially reimbursed by SPJ for the cost of his flight to Atlanta.

210.    Two Mexican men from SPJ picked up Mr. Martinez and other TN Visa workers at the Atlanta airport and transported them to an apartment complex in Alabama.

211.    Mr. Martinez and his roommates paid approximately $600 per person each month to Allswell for rent. Mr. Martinez and his roommates were also responsible for paying Allswell's utility bill for the apartment directly after an initial three-week period when Allswell paid the utility bills.

212.    In early May 2020, Mr. Martinez started working for SL Alabama.

213.    On his first day, he was provided with a blue t-shirt with an SL Alabama logo and was placed to work on the production line.

214.    Mr. Martinez immediately learned that the job he had been promised did not exist (or at least did not exist for him). Rather than perform technical services as promised by SPJ and SL Alabama and as required for a TN visa, Mr. Martinez was required to perform manual labor on a production line.

215.    The production line work required no technical skill and involved the repetitive installation of front and rear headlights.

216.    Mr. Martinez assembled approximately 150 lights each day. He repetitively had to screw 15-20 screws in each light that was assembled.

217.   Mr. Martinez spent his entire 12-hour shift using his hands in repetitive motions.

218.   As a result, Mr. Martinez's back, hands, and feet hurt, and he was constantly exhausted.

219.   Throughout Mr. Martinez's employment, SL Alabama paid him $11.50 per hour to work for the company.

220.   Mr. Martinez received supervision and direction regarding how to perform his job from SL Alabama and SPJ supervisors during the course of his joint employment with these Defendants. SL Alabama and SPJ supervisors controlled his job duties and directed him on how to perform the assigned manual labor tasks.

221.   In addition to the non-technical, repetitive, production line manual labor which was a different position than promised, Mr. Martinez was required to work substantial overtime.

222.   He worked 12 hours shifts at night and worked 6 days per week. Working overtime and working the night shift was mandatory and Mr. Martinez was not provided with any options to work fewer hours, fewer days per week, or to work the more desirable day shift.

223.   Mr. Martinez was exhausted from working up so many hours and days per week.

224.   SPJ and SL Alabama discriminated against Mr. Martinez during his employment.

225.   While Mr. Martinez was required to work 72 hours per week under threat of termination and deportation, other SL Alabama employees who were U.S. citizens or nationals, non-Mexican nationals, and/or non-Hispanic were only required to work 40 hours per week without threat of termination.

226.   While Mr. Martinez was paid $11.50 per hour, other SL Alabama employees who were U.S. citizens or nationals, non-Mexican nationals, and/or non-Hispanic were paid significantly more for the same job duties, yet they had less experience and fewer qualifications.

227.   In late November 2021, Mr. Martinez returned to Mexico for a few days.

228.   On November 28, 2021, Mr. Martinez travelled back to work for SL Alabama and arrived at the Atlanta airport. Upon arrival, he was stopped by Customs and Borden Protection ("CBP") and sent to a secondary screening.

229.   Mr. Martinez was detained for two to three hours. His cell phone was confiscated and not returned. He was also asked questions about his job at SL Alabama and showed the officials paystubs and the two offer letters SPJ provided to him.

230.    An official from CBP told him that the hourly rate did not correspond to what was stated in the two offer letters.

231.    An official from CBP further asked Mr. Martinez about his job duties. Mr. Martinez truthfully answered that he was working as an operator, rather than as a production technician.

232.    An official from CBP told Mr. Martinez that they were looking out for SPJ. The official further told him: "We know it's not your fault. It's the company's fault. We're investigating the company."

233.    As a result of the fraud committed by SPJ and SL Alabama, Mr. Martinez's TN visa was cancelled and he was deported to Mexico the following day. He was also barred from reentering the United States for 5 years.

234.    On December 2, 2021, Mr. Martinez emailed Edgar Contreras at SL Alabama and wrote the following in Spanish, translated to English:

> Good afternoon Edgar The situation was as follows: I arrived in Atlanta on November 28, 2021 at 5:30pm. They asked me what position I had to which I responded to the production operator, they sent me to detention to investigate me since the visa says Technician Sientific [sic]. They asked me where I worked and what functions I did, they questioned me for 2 hours that SPJ connect gave me where in one it said a salary of $32,000 USD per year and the other $42,000 USD. They told me that it was a crime and fraud but that it was not a matter of me but of SPJ! They told me that I had to cooperate and tell the truth since otherwise the officer would go to the SL Alabama plant to begin an investigation of how many more Mexicans there were in the same situation. They stopped me right there and put me in a room where I stayed all night until the next day when I was returned to Mexico at 10:30 a.m. the

plane left from Atlanta to MTY. They canceled my visa and denied me entry to the USA for 5 years. Thank you.

(Exhibit 9).

235.   Mr. Martinez also alerted SPJ about his deportation.

236.   Among many injuries caused by the fraudulent scheme, the denial of Mr. Martinez's return to the United States, cancellation of his TN visa, and disbarment from the United States caused him to lose his personal belongings, which were still in the Allswell and SPJ apartment he had lived in. He also lost the car he purchased in the United States.

### Plaintiff Alberto Vazquez Garcia

237.   Mr. Vazquez was born and raised in Mexico, is a citizen of Mexico, and is not a citizen of the United States.

238.   Mr. Vazquez is a skilled technician and engineer.

239.   Mr. Vazquez has over 20 years of experience working as an ecology engineer.

240.   In Mexico, Mr. Vazquez attended Universidad Autonomous de Chihuahua to become an engineer.

241.   In February 2021, Mr. Vazquez learned about the job at issue in this case from the Facebook page of Yadira Leos, a recruiter at SPJ Connect. The job post she shared from SPJ on Facebook stated that SPJ "places you in the United

States to work 100% legally" and stated they were looking for "Production Technicians." It further stated that the essential requirements were having a valid passport, a professional license or bachelor's degree, and intermediate English. The posting provided an email address to submit resumes.

242.   At the beginning of March 2021, Mr. Vazquez applied for the job by sending his resume to the email address on the job posting.

243.   He was contacted by Jesus Baez from SPJ Connect a few days later.

244.   Mr. Baez coordinated an interview for Mr. Vazquez with a Korean man named Kim via Skype for the following day.

245.   On or about March 3, 2021, Mr. Vazquez attended the video interview with Kim, which lasted approximately 15-20 minutes.

246.   During the interview, Kim asked Mr. Vazquez about his university degree and experience as an engineer in Mexico.

247.   Kim told Mr. Vazquez that the job he was interviewing for was a production technician job and explained that Mr. Vazquez, if hired, would be in charge of a production line at SL Alabama.

248.   Kim also explained that the pay would increase to $18 per hour once he arrived in the United States and started working at SL Alabama.

249.   On March 5, 2021, Mr. Baez emailed Mr. Vazquez a copy of an offer

letter from SL Alabama that was dated March 3, 2021.

250.   In the email, Mr. Baez wrote: "Hard work and dedication will always pay off for people who pursue their dreams just like you. Few of us are fortunate enough to have this kind of opportunity during the pandemic with the lack of work we are experiencing in our country. Attached you will find your job offer letter from the company SL America. Please, read it in detail, and feel free to reach out to us if you have any questions. We will gladly support you. If you have no doubts, please sign the letter, scan it, and send it back to us." The letter further gave Mr. Vazquez 24 hours to inform SPJ regarding whether he was accepting the job offer.

251.    The offer letter was addressed to Mr. Vazquez and offered him the job of Production Technician at the SL Alabama plant. (Exhibit 10).

252.   The offer letter indicated, among other things, that:

      e.      His job title was production technician;

      f.      His yearly compensation was $32,000;

      g.      His hourly wage rate was $11.00 per hour plus overtime;

      h.      Other benefits included 8 weeks of housing and transportation, and health insurance would be paid 70% by the company. *Id.*

253.   This offer letter was signed by an official at SL Alabama. *Id.*

254.   Mr. Vazquez signed the agreement on March 5, 2021, indicating he

understood and agreed to the terms of the job offer. *Id.* He emailed it back to Mr. Baez the same day.

255.   On March 7, 2021, Gloria Gamez from SPJ emailed Mr. Vazquez and explained she was "supporting [him] with the work visa process" and asked for additional information to complete the visa paperwork.

256.   On March 11, 2021, SPJ provided Mr. Vazquez with a new offer letter on SL Alabama letterhead. The offer letter was signed by Daesig Choi, President of SL Alabama. The letter offered him a job as a Production Technician at SL Alabama. (Exhibit 11).

257.   Gloria Gamez from SPJ explained to Mr. Vazquez that a new offer letter with a higher salary was being provided to him because the $32,000 salary in the first offer letter would probably get denied at the embassy. She explained that the second offer letter was provided so there "wouldn't be a problem" at the embassy.

258.   Ms. Gamez further told Mr. Vazquez to provide only the second offer letter to the embassy and not to mention anything about SPJ during the interview at the consulate. She said: "SPJ doesn't exist. Tell the embassy you only spoke with the company (SL Alabama)."

259.   The second offer letter stated: "We are satisfied with your academic

background and professional knowledge. We believe you will be a valuable asset to the growth of this company's business in the U.S." (Exhibit 11).

260.   The offer letter further stated that the terms and conditions of employment were the following:

      a.     The job title would be production technician;

      b.     The annual salary was $42,000;

      c.     The employment period was up to three years from March 29, 2021 "contingent upon approval of TN-2 petition by the U.S. CIS." *Id.*

261.   The second offer letter replaced and discharged the initial offer letter.

262.   In an effort to get Mr. Vazquez a TN visa so he could come to work at the SL Alabama plant, SL Alabama also prepared and SPJ sent him a TN visa Support Letter pursuant to 8 C.F.R. 214.6(D)(3) dated March 11, 2021, which was addressed to the United States Consulate in Mexico. (Exhibit 12).

263.   The Support Letter was on SL Alabama letterhead and signed by SL Alabama President Daesig Choi. *Id.*

264.   The letter stated that the business conducted by SL Alabama "shall be carried out in accordance with the laws and regulations of the respective countries and respect the customs of the trade." *Id.,* p. 1.

265.   The Support Letter to the U.S. Consulate outlined, among other things, that Mr. Vazquez was being offered a job as a production technician where he would "utilize his academic background in ecology engineering and professional experiences in the field of Production to support the company in the development, analysis, improvement, and implementation of process definition and control procedures, management, of the flow of materials and equipment specifications, and process yield capabilities to help improve the efficiencies." *Id.,* p. 2.

266.   The Support Letter further stated that his "main job duties" would include the following:

      a.    Provide technical support to improve operations processes;

      b.    Utilize a sequential flow pattern in the process;

      c.    Minimize backtracking of work in the process;

      d.    Implement a predictable process;

      e.    Analyze, develop, and optimize workflows within the production process across all departments to improve efficiency throughout the company;

      f.    Provide technical support to improve company operations and eliminate waste;

      g.    Develop best practices, routines, and innovate new solutions to

improve production rates and overall part quality;

    h.    Work closely with Quality team to create, improve, and develop standardized work instructions;

    i.    Develop and implement activity plans for projects;

    j.    Confer with other staff regarding manufacturing capabilities, production schedules, and other considerations to facilitate production processes and reduce costs.  *Id.*

267.   The Support Letter from SL Alabama further explained that Mr. Vazquez was qualified for the TN visa job because, among other things, he had 15 years of engineering experience and the "required knowledge and sophistication that would enable him to comprehend complex engineering concepts and scientific theoretical principles." *Id.,* p. 2.

268.   The Support Letter further proposed to hire Mr. Vazquez for a temporary three-year period and stated it would compensate him "$42,000 per year plus a standard package of employee benefits including 8 weeks of housing and transportation." *Id.,* p. 3.

269.   Although unknown to Mr. Vazquez, the required job qualifications and the position description provided in the job offer and Support Letter to secure the TN visa were false.

270.   At the time Mr. Choi signed the Support Letter, he knew the representations about the job qualifications and the job description were false.

271.   Also unknown to Mr. Vazquez, he was the victim of a fraudulent scheme to secure his employment for manual (non-technical) production line work at SL Alabama.

272.   On March 14, 2021, Ms. Gamez emailed Mr. Vazquez to help prepare him for his upcoming consulate interview. She explained that his appointment was scheduled for fingerprinting, photography, and the interview. She also stated: "We will also have a call a day before to give you more recommendations and clarify doubts." (Exhibit 13).

273.   In mid-March 2021, Mr. Vazquez travelled to the U.S. Consulate in Mexico City for an interview to obtain a TN visa.

274.   Mr. Vazquez incurred travel and food costs which were not reimbursed.

275.   Mr. Vazquez paid $160 to apply for the TN visa. This cost was also not reimbursed.

276.   Mr. Vazquez sold his car so that he could pay for the visa fee and associated travel costs.

277.   The scheme by Defendants to fraudulently secure a TN visa for Mr. Vazquez was successful and, in reliance on the misrepresentations in the Support

Letter, the U.S. government granted a TN visa for Mr. Vazquez to work on a temporary basis in the United States at SL Alabama.

278.   On April 1, 2021, in reliance on the promises made by SL Alabama and SPJ concerning the job promised to him in the Support Letter and his eligibility for that job under U.S. law, Mr. Vazquez moved from Mexico to the U.S. to begin work at the SL Alabama facility in Alabama.

279.   Mr. Vazquez paid for his flight to Alabama but was only partially reimbursed by Allswell for these expenses.

280.   Upon arriving in Alabama with eight other TN visa workers, Mr. Vazquez was picked up by two other Mexican workers, Julian and Hector, who represented that they worked for SPJ.

281.   Mr. Vazquez was subsequently taken to an apartment complex in Alabama where Allswell directed him to live with three other TN visa workers.

282.   In early April 2021, Mr. Vazquez started working at SL Alabama.

283.   When Mr. Vazquez began the job, he had already expended significant costs and expenses to travel to the United States, and he had foregone other employment opportunities.

284.   Mr. Vazquez immediately learned that the job he had been promised did not exist (or at least did not exist for him). Rather than perform technical services

as promised by SPJ and SL Alabama and as required for a TN visa, Mr. Vazquez was required to perform manual labor on a production line.

285.  The production line work required no technical skill and involved the repetitive installation of front headlights. Mr. Vazquez repetitively connected wires and put screws into the front headlights. He estimates completing 360 pieces in one shift and screwing 2,000 or 2,500 screws in a single day.

286.  Mr. Vazquez performed strenuous and physically demanding work. As a result, his body hurt. He was only afforded minimal breaks and, when there was an interruption in the production line, SL Alabama prohibited him and other TN visa workers from squatting or sitting down -- even for a minute.

287.  During Mr. Vazquez's employment, he was paid $11 per hour. His hourly rate was later increased to $11.50 per hour in July 2021, and $12 per hour in October 2021.

288.  Mr. Vazquez worked alongside employees of SL Alabama and was supervised and received instruction on how to perform his job from SL Alabama supervisors.

289.  The SL Alabama supervisors directing Mr. Vazquez's work wore shirts with an SL Alabama logo.

290.  Mr. Vazquez was supervised by a Black American team leader named

56

Lisa and a Mexican individual named Francisco. Lisa regularly berated him and other TN visa workers, including yelling at them, and requiring that they perform more work than American workers on her production line.

291.   The supervisors told Mr. Vazquez which station to work at, instructed him on how to perform his job, and monitored and corrected his work.

292.   Mr. Vazquez was also required to work overtime. He worked twelve-hour shifts and six-day workweeks.

293.   The first week, he worked seven days per week. When he asked for a break and to rest, officials from SL Alabama told him that was not allowed.

294.   On several other occasions, when he spoke to Iñaki, a Mexican worker who wore an SL Alabama shirt and purported to work for SL Alabama's Human Resources Department, about working less hours per week. Iñaki told him that the overtime was required and it was in his contract.

295.   Defendants Allswell and SL Alabama made it clear to Mr. Vazquez that the lengthy hours and schedule were mandatory.

296.   After Mr. Vazquez and other TN visa workers at SL Alabama complained about the hours they were working at manual labor and the low wages they were being paid, they were called into a meeting with SPJ and Allswell President Younglin Lee at one of the apartment units at the complex where they

lived.

297.   Mr. Lee angrily yelled at Mr. Vazquez and the other TN visa workers. He yelled that he had provided these workers with an opportunity and they had to accept it – and if they did not accept it, they would be fired and immigration officials would be notified.

298.   Mr. Lee also threatened Mr. Vazquez and others by stating that if anyone left the job, Mr. Lee would call immigration authorities and notify them so that the TN visa could be taken away from them and they would be deported. He further intimidated the workers by stating that he knew where they all lived in case they "did anything more"—which Mr. Vazquez understood to mean if a complaint or lawsuit was filed.  Based on Mr. Lee's threat to Mr. Bastidas that he would be immediately evicted (and terminated) if he complained, which Mr. Vazquez heard, Mr. Vazquez reasonably believed this reference to knowing where they lived was a threat of immediate eviction.

299.   Throughout Mr. Vazquez's employment, he lived with three TN visa worker roommates in a two-bedroom apartment that was leased by Allswell. Mr. Vazquez and his roommates had to pay $600 each per month to Allswell for rent. They were also responsible for paying Allswell for the cost of utilities. However, several times the power was cut off because Allswell did not pay the utility bill on

time, even though Plaintiff Vazquez and his roommates provided the money on time.

300.   Mr. Vazquez spoke with the owner of the apartment complex several times regarding moving to his own apartment, but he was told that he needed the permission of someone at Allswell to do that. When Mr. Vazquez sought permission from Allswell, it was denied. He was thus never allowed to move out of the Allswell apartment.

301.   As outlined above, Mr. Vazquez did not perform the technical services he was promised or that required the job qualifications SPJ and SL Alabama indicated were necessary for the position.

302.   At the end of December 2021, Mr. Vazquez was promoted to team leader, but he was only going to be given a $1 per hour raise to about $13 per hour.

303.   At this point, Mr. Vazquez reached his breaking point, quit his job, and returned to Mexico at his own expense. He determined he would rather bear the costs and risks of leaving than continue working (a) excessive mandatory overtime, (b) in poor working conditions at a manual labor position that was contrary to what he had been promised, (c) for lower pay than he was promised, and (d) under threat of deportation if he complained.

### *Plaintiff Jesus Abnert Hernandez Nunez*

304.   Mr. Hernandez was born and raised in Mexico, is a citizen of Mexico,

59

and is not a citizen of the United States.

305.   Mr. Hernandez is a skilled technician and engineer.

306.   Mr. Hernandez has over four years of experience working as an engineer.

307.   In Mexico, Mr. Hernandez attended Instituto Politécnico Nacional to become an engineer.

308.   On or around February 2021, Mr. Hernandez learned about an engineering job opportunity from an SPJ job posting on LinkedIn. He subsequently submitted his resume.

309.   After he applied, Julia Vega, a "Senior Specialist/Headhunter" from SPJ, emailed Mr. Hernandez on February 17, 2021. The email confirmed that he would be interviewing for a vacant position at SL America in Alexander City, Alabama. The salary would be $42,000 per year, and the benefits would include housing and transportation provided by the company for 8 weeks. The email further explained that once he completed an interview and received a job offer, he would need to obtain a TN Visa at his own expense. (Exhibit 14).

310.   Mr. Hernandez participated with an interview with SPJ staff where he was asked to provide more details about his engineering degree and background, which he did.

311.   On March 5, 2021, Jesus Baez from SPJ emailed Mr. Hernandez a copy of an offer letter from SL Alabama, and wrote the following: "Hard work and dedication will always pay off for people who pursue their dreams just like you. Few of us are fortunate enough to have this kind of opportunity during the pandemic with the lack of work we are experiencing in our country. Attached you will find your job offer letter from the company SL America. Please, read it in detail, and feel free to reach out to us if you have any questions. We will gladly support you. If you have no doubts, please sign the letter, scan it, and send it back to us."  The letter further gave Mr. Hernandez 24 hours to inform SPJ regarding whether he was accepting the job offer.

312.   The offer letter was on SL Alabama letterhead and was addressed to Mr. Hernandez. The letter offered him a Production Technician job at the SL Alabama plant. (Exhibit 15).

313.   The offer letter indicated, among other things, that:

     i.     His job title was production technician;

     j.     His yearly compensation was $32,000;

     k.     His hourly wage rate was $11.00 per hour plus overtime;

     l.     Other benefits included 8 weeks of housing and transportation, and health insurance would be paid 70% by the company.  *Id.*

314.   This offer letter was signed by an official at SL Alabama. *Id.*

315.   Mr. Hernandez signed the agreement on March 5, 2021, indicating he understood and agreed to the terms of the job offer. *Id.* He emailed it back to Mr. Baez the same day.

316.   On March 7, 2021, Joram Morales from SPJ emailed Mr. Hernandez and stated he worked for the company's "Legal and Visa Processing Department" and requested certain documents from Mr. Hernandez, including his passport, visa, professional title, professional card, resume, and other forms. Mr. Hernandez provided all the requested information to Mr. Morales. (Exhibit 16).

317.   On March 10, 2021, Joram Morales from SPJ provided Mr. Hernandez with a new and second offer letter for the Production Technician job on SL Alabama letterhead.  (Exhibit 17).

318.   The second offer letter replaced and discharged the initial offer letter.

319.   The second offer letter was signed by Daesig Choi, President of SL Alabama and offered him a job as a Production Technician at SL Alabama with an increased salary of $42,000.  *Id.*

320.   Mr. Hernandez was directed by SPJ to only provide the second offer letter to the embassy.

321.   The second offer letter stated: "We are satisfied with your academic

background and professional knowledge. We believe you will be a valuable asset to the growth of this company's business in the U.S." *Id.*

322.   The second offer letter further stated that the terms and conditions of employment were the following:

a.   The job title would be production technician;

b.   The annual salary was $42,000;

c.   The employment period was up to three years from March 19, 2021 "contingent upon approval of TN-2 petition by the U.S. CIS." *Id.*

323.   In an effort to get Mr. Hernandez a TN visa so he could come to work at the SL Alabama plant, SL Alabama also prepared and SPJ sent him a TN visa Support Letter pursuant to 8 C.F.R. 214.6(D)(3) dated March 8, 2021, which was addressed to the United States Consulate in Mexico.  (Exhibit 18).

324.   The Support Letter was on SL Alabama letterhead and signed by SL Alabama President Daesig Choi. *Id.*

325.   The letter states that the business conducted by SL Alabama "shall be carried out in accordance with the laws and regulations of the respective countries and respect the customs of the trade." (*Id.,* p. 1).

326.   The Support Letter to the U.S. Consulate outlined, among other things,

that Mr. Hernandez was being offered a job as a production technician where he would "utilize his academic background in Aeronautical Engineering and professional experiences in the field of Maintenance to improve production facilities with most efficiency and quality, reducing the incidence of costly breakdowns using the appropriate technology for the company." (*Id.*, p. 2).

327. The Support Letter stated his main job duties would be the following:

a. Provide maintenance support in the processes and activities for maintaining all plant machines, equipment and other physical assets to ensure safe, continual and efficient operation.

b. Develop maintenance strategies through the analysis of technological factors for the maintenance master plan that guarantees the availability and reliability focus maintenance process of the plant.

c. Plan and execute preventive maintenance schedules of various equipment to increase machine up time and equipment reliability -routine preventative, corrective, predictive and shutdowns works.

d. Perform corrective and preventive maintenance activities on systems to provide continuous performance of production

machines and equipment and other systems required for operations.

e.  Ensure that periodic predictive, preventive and corrective maintenance of all plant equipment, machinery, facilities and other physical assets are appropriately scheduled and accomplished and that emergency and maintenance support are readily available as needed. *Id.,* p. 2.

328.  The Support Letter from SL Alabama further explained that Mr. Hernandez was qualified for the TN visa job because, among other things: "He earned a Bachelor´s degree in Aeronautical Engineering from the University "Instituto Politécnico Nacional" in Mexico. In addition, he has over (4) years of engineering experience (please see enclose copies of his resume and academic credential). He has the required knowledge and sophistication that would enable him to comprehend complex engineering concepts and scientific theoretical principles." (*Id.,* p. 2).

329.  The Support Letter further proposed to hire Mr. Hernandez for a temporary three year period and stated it would compensate him "$42,000 per year plus a standard package of employee benefits including housing and transportation." (*Id.*, p. 3).

65

330.   Although unknown to Mr. Hernandez, the required job qualifications and the position description provided in the job offer and Support Letter to secure the TN visa were false.

331.   At the time SL Alabama signed the Support Letter, SPJ and SL Alabama knew the representations about the job qualifications and the job description were false.

332.   Also unknown to Mr. Hernandez, he was the victim of a scheme to secure his employment for manual (non-technical) production line work at SL Alabama.

333.   On March 10, 2021, Joram Morales from SPJ also emailed Mr. Hernandez a guide that was signed by "Mexico Lawyer" to help prepare him for his upcoming consulate interview. (Exhibit 19).

334.   This interview guide made clear that the only job offer letter he should bring with him to the embassy was the one provided to him in a package of documents sent to him via DHL. In other words, the offer letter with the higher salary should be provided to the embassy. The guide further stated: "YOU SHOULD NOT CARRY FOR ANY REASON THE "JOB OFFER" THAT YOU RECEIVED IN YOUR MAIL FROM THE COMPANY, since that is only an internal [document] of the company, and IT IS NOT FOR USE at the consulate…" *Id.,* p. 1.

335.   The guide also included sample questions and answers for his consulate interview, including the following:

a.   "What type of Visa are you applying for? ANSWER= TN VISA"

b.   "Who is the US Employer? SL corporation, a Korean company which has plants in seven countries, but the business name is SL America."

c.   "Where is the Company located? (Address) 2481 Airport Boulevard , Alexander City , Alabama."

d.   "What does the company do? SL produces all kinds of lamps for automotive such as head lamps, rear lamps, fog lamps and CHMSLs. Also, we are leading the market with high-quality LED lamps and advanced automotive lighting systems, Chassis, Front mirror, and advanced driver assist Systems."

e.   "What will be your job title or job position? Maintenance Technician."

f.   "What will be your daily job duties or main activities? Provide maintenance support in the processes and activities for maintaining all plant machines, equipment, and other physical assets to ensure safe, continuous, and efficient operation.

Develop maintenance strategies through the analysis of technological factors for the maintenance master plan that guarantees the availability and reliability focus maintenance process of the plant. Plan and execute preventive maintenance schedules of various equipment to increase machine up time and equipment reliability -routine preventative, corrective, predictive and shutdowns works. Perform corrective and preventive maintenance activities on systems to provide continuous performance of production machines and equipment and other systems required for operations. Ensure that periodic predictive, preventive, and corrective maintenance of all plant equipment, machinery, facilities and other physical assets are appropriately scheduled and accomplished and that emergency and maintenance support are readily available as needed"

g. "Why are you qualified for this position? Because these activities are not new to me since in my career I have always been involved in these types of activities, as you can see in my first job I worked as a maintenance engineer in an aeronautical industry, in which I oversaw programming, planning and supervision of preventive

and predictive maintenance, as well as developing some of them, since I have a license as a class I maintenance technician. After this job I am currently working as a jr planner in which I review preventive maintenance and provide technical support to them, additionally I collaborate with them in daily maintenance activities to prolong the life of the assets ensuring that the maintenance work is carried out according to the manufacturer's standards."

h. "What are the terms of compensation or what will be your annual salary? $42,000 per year PLUS BENEFITS (HOUSING AND TRANSPORTATION)."

i. "Write why your career qualifies for the job position at the Company?   Because I studied an engineering related to maintenance in general, in which I took subjects such as engines, combustion engines, materials engineering, aircraft systems, among others in which I managed to develop my practical skills in machine maintenance, such as lubrication, inspections and component changes." (Exhibit 19, pp. 4-6).

336.  In March 2021, Mr. Hernandez travelled to the U.S. Consulate in

Mexico City for an interview to obtain a TN visa.

337.  Mr. Hernandez incurred travel and food costs which were not reimbursed.

338.  Mr. Hernandez paid $160 to apply for the TN visa. This cost was also not reimbursed.

339.  The scheme by Defendants to fraudulently secure a TN visa for Mr. Hernandez was successful and, in reliance on the misrepresentations in the Support Letter, the U.S. government granted a TN visa for Mr. Hernandez to work on a temporary basis in the U.S. at SL Alabama.

340.  At the end of March 2021, in reliance on the promises made by SL Alabama and SPJ concerning the job promised to him in the Support Letter and his eligibility for that job under U.S. law, Mr. Hernandez moved from Mexico to the U.S. to begin work at the SL Alabama facility in Alabama.

341.  Upon arriving in Alabama, Mr. Hernandez was picked up by two SPJ employees, Julian and Hector.

342.  Mr. Hernandez was subsequently taken to an apartment complex in Alabama to live with three other TN visa workers.

343.  In March 2021, Mr. Hernandez started working for SL Alabama.

344.  When Mr. Hernandez began the job, he had already expended

significant costs and expenses to travel to the United States, and he had foregone other employment opportunities.

345.   Mr. Hernandez immediately learned that the job he had been promised did not exist (or at least did not exist for him). Rather than perform technical services as promised by SPJ and SL Alabama and as required for a TN visa, Mr. Hernandez was required to perform manual labor on a production line.

346.   The production line work required no technical skill and involved the repetitive assembly of headlights with screws and cables. Mr. Hernandez repetitively connected wires and put screws into the headlights.

347.   Mr. Hernandez performed strenuous and physically demanding work. As a result, his body and hands hurt, especially because of the long hours worked.

348.   During Mr. Hernandez's employment, he was paid $11 per hour. In June 2021, his pay was increased to $11.50 and it was increased once more to $13 per hour in September 2021.

349.   Mr. Hernandez worked alongside employees of SL Alabama and was supervised and received instruction on how to perform his job from SL Alabama supervisors.

350.   These supervisors told Mr. Hernandez which station to work at, instructed him on how to perform his job, and monitored and corrected his work.

351.   The SL Alabama supervisors directing Mr. Hernandez's work wore a shirt with an SL Alabama logo.

352.   Officials from SPJ and SL Alabama informed Mr. Hernandez that anytime he had a concern, Mr. Hernandez should direct those concerns to SPJ through Julian and Hector.

353.   On several occasions, when Mr. Hernandez spoke to Iñaki Arenas Zenteno, an HR Assistant Manager at SL Alabama, about issues he had with the hours, compensation, and job, Mr. Arenas told Mr. Hernandez and other TN Visa workers to direct any complaints directly to SPJ because they brought Mr. Hernandez to the job. Indeed, Mr. Hernandez was specifically told not to go directly to SL Alabama with concerns about his job.

354.   Mr. Hernandez was also required to work overtime. He worked 12-hour shifts and six-day workweeks.

355.   Defendants SPJ and SL Alabama have made it clear to Mr. Hernandez that the long hours and schedule are mandatory.

356.   Mr. Hernandez's shift supervisor at SL Alabama informed him that he can't work fewer days or hours per week.

357.   SPJ also informed Mr. Hernandez that if he didn't work 6 days a week, it would be considered job abandonment and he would be fired.

358.   In April 2021, after Mr. Hernandez and other TN Visa workers at SL Alabama complained about the hours they were working, the low wages they were being paid, and the manual labor they were required to perform, they were called into a captive-audience meeting with SPJ and Allswell principal Younglin Lee at one of the apartment units at the complex where they lived. Mr. Lee yelled at them. He angrily told them that he had provided them with an opportunity and they had to accept it.

359.   Mr. Lee was yelling and irritated. He angrily told them that he had provided them with an opportunity and they had to accept it, and if they did not accept it, they would be fired and immigration officials would be notified.

360.   Mr. Lee was insulted by the workers' complaints, and told them, in sum and substance: "We brought you here from Mexico. Most Mexicans come here to work in landscaping or washing dishes in restaurants. We're giving you an opportunity to do something better and different and you're complaining?"

361.   Mr. Lee also threatened Mr. Hernandez and others by stating that if anyone left the job, he would call immigration and notify them so that the TN visa could be taken away from them.

362.   After being subjected to these threats and observing how angry Mr. Lee was, Mr. Hernandez stopped complaining because he was scared.

363. Throughout Mr. Hernandez's employment, he lived with three TN visa works roommates in a two-bedroom apartment that was leased by SPJ. Mr. Hernandez and his roommates had to pay $600 each per month to SPJ for rent. They were also responsible for paying utilities.

364. Mr. Hernandez asked Julian and Hector if he could move out of the apartment and get his own apartment at the same complex or somewhere else, but he was told he could not.

365. As outlined above, Mr. Hernandez did not perform the technical services he was promised or that required the job qualifications SPJ and SL Alabama indicated were necessary for the position.

366. In July 2022, Mr. Hernandez reached his breaking point and quit his job. He determined he would rather bear the costs and risks of leaving than continue working (a) excessive mandatory overtime, (b) in poor working conditions at a manual labor position that was contrary to what he had been promised (c) for lower pay than he was promised, and (d) under threat of eviction and deportation if he complained.

### *Plaintiff Sebastian Gutierrez Hernandez*

367. Mr. Gutierrez was born and raised in Mexico, is a citizen of Mexico, and is not a citizen of the United States.

368.   Mr. Gutierrez is a skilled technician and engineer. He has over eight years of experience working as an engineer.

369.   In Mexico, Mr. Gutierrez attended Universidad Tecnológica de Torreón.

370.   In February 2021, SPJ visited the school's campus to recruit potential TN visa workers for alleged engineering jobs.

371.   On the same day that SPJ visited the school, they coordinated virtual interviews for Mr. Gutierrez and others via Skype.

372.   Mr. Gutierrez interviewed with a Korean man named Blue Kim from SPJ.

373.   During the interview, Mr. Gutierrez was asked questions about his engineer experience and he outlined his professional history and eight-year career as an engineer.

374.   On March 5, 2021, "Senior Specialist/Headhunter" Julia Vega from SPJ emailed Mr. Gutierrez to thank him for applying for a job with SL America. She wrote, in part: "The reason for this email is to inform you that we are still waiting for a response from the company, your resume has already been sent and is being reviewed. As soon as I have a response, which I hope will be this week, I will be happy to notify you." (Exhibit 20).

375.   SPJ subsequently sent Mr. Gutierrez an offer letter dated March 3, 2021, on SL Alabama letterhead and signed by an SL Alabama official offering him a job as a production technician with the company. (Exhibit 21).

376.   The offer letter indicated, among other things, that:

    a.  His job title was production technician;

    b.  His yearly compensation was $32,000;

    c.  His hourly wage rate was $11.00 per hour plus overtime;

    d.  Benefits included 8 weeks of housing and transportation, and health insurance would be paid 70% by the company. *Id*

377.   Mr. Gutierrez signed the agreement on March 5, 2021 indicating he understood and agreed to the terms of the job offer. (Exhibit 21).

378.   In an effort to get Mr. Gutierrez a TN visa so he could come to work at the SL Alabama plant, SL Alabama also prepared and SPJ sent him a TN visa Support Letter pursuant to 8 C.F.R. 214.6(D)(3) dated March 11, 2021, which was addressed to the United States Consulate in Mexico.  (Exhibit 22).

379.   The Support Letter was on SL Alabama letterhead and signed by SL Alabama President Daesig Choi. *Id.*

380.   The letter stated that the business conducted by SL Alabama "shall be carried out in accordance with the laws and regulations of the respective countries

and respect the customs of the trade." *Id.,* p. 1.

381.   The Support Letter further explained that Mr. Gutierrez's "academic background and experience supports his designation to serve as Scientific Technician in the United States." (*Id.*, p. 3). The letter further detailed his professional experience, and the numerous training courses he had obtained, as well as his work history as an engineer.

382.   The Support Letter stated that his job duties would be the following:

a.   Provide Technical Support to improve operations processes; Utilize a sequential flow pattern in the process; Minimize backtracking of work in the process; Implement a predictable process.

b.   Analyze, develop and optimize work flows within the production process across all departments to improve efficiency throughout the company.

c.   Provide technical support to improve company operations and eliminate waste.

d.   Develop best practices, routines and innovate new solutions to improve production rates and overall part quality.

e.   Work closely with the Quality team to create, improve and

develop standardized work instructions.

    f.  Develop & implement activity plans for projects.

    g.  Confer with other staff regarding manufacturing capabilities, production schedules, and other considerations to facilitate production processes and reduce costs.  *Id.,* p. 3.

383.  The Support Letter further proposed to hire Mr. Gutierrez for a temporary three-year period and stated it would compensate him "$42,000 per year plus a standard package of employee benefits including 8 weeks of housing and transportation." (*Id.,* p. 4).

384.  Although unknown to Mr. Gutierrez, the required job qualifications and the position description provided in the job offer and Support Letter to secure the TN visa were false.

385.  At the time SL Alabama President Daesig Choi signed the Support Letter, he knew the representations about the job qualifications and the job description were false.

386.  Also unknown to Mr. Gutierrez, he was the victim of a scheme to secure his employment for manual (non-technical) production line work at SL Alabama.

387.  On or around March 2021, Mr. Gutierrez travelled to the U.S. Consulate in Mexico City for an interview to obtain a TN visa.

388.   Mr. Gutierrez incurred travel and food costs which were not reimbursed.

389.   Mr. Gutierrez paid $160 to apply for the TN visa. This cost was also not reimbursed.

390.   The scheme by Defendants to fraudulently secure a TN visa for Mr. Gutierrez was successful and, in reliance on the misrepresentations in the Support Letter, the U.S. government granted a TN visa for Mr. Gutierrez to work on a temporary basis in the U.S. at SL Alabama.

391.   In April 2021, in reliance on the promises made by SL Alabama and SPJ concerning the job promised to him in the Support Letter and his eligibility for that job under U.S. law, Mr. Gutierrez moved from Mexico to the U.S. to begin work at the SL Alabama facility in Alabama.

392.   Upon arriving in Alabama, Mr. Gutierrez was taken to an apartment complex in Alabama to live with three other TN visa workers.

393.   The day he arrived, SPJ President Youngjin "Paul" Lee, was at the apartment complex holding a captive-audience meeting with the TN visa workers placed at SL Alabama as a result of complaints that apparently had been made about the manual labor they were required to perform, the overtime hours, and lower pay than what had been promised.

394.   During the meeting, TN visa workers at SL Alabama complained that their offer letters promised they would be making more money per hour and explained they were not working as engineers but instead as operators.

395.   Mr. Lee was yelling and irritated. He angrily told them that he had provided them with an opportunity and they had to accept it, and if they did not accept it, they would be fired and immigration officials would be notified.

396.   Mr. Lee said he would rather lose money than jeopardize his reputation and expressed that these workers did not show any respect for the job opportunity.

397.   Mr. Lee was insulted by the workers' complaints, and told them, in sum and substance: "We brought you here from Mexico. Most Mexicans come here to work in landscaping or washing dishes in restaurants. We're giving you an opportunity to do something better and different and you're complaining?"

398.   Mr. Gutierrez walked away from this meeting with an understanding that if he had any complaints about his job or pay, he needed to keep quiet.

399.   When Mr. Gutierrez began the job at SL Alabama, he had already expended significant costs and expenses to travel to the United States, and he had foregone other employment opportunities.

400.   Mr. Gutierrez immediately learned that the job he had been promised did not exist (or at least did not exist for him). Rather than perform technical services

80

as promised by SPJ and SL Alabama and as required for a TN visa, Mr. Gutierrez was required to perform manual labor on a production line.

401.   The production line work required no technical skill and involved the repetitive assembly of headlights with screws and wires. Mr. Gutierrez repetitively connected wires and put screws into the headlights.

402.   Mr. Gutierrez performed strenuous and physically demanding work. As a result, his body and hands hurt, especially because of the long hours worked.

403.   SPJ and SL Alabama discriminated against Mr. Gutierrez during his employment.

404.   While Mr. Gutierrez was required to work overtime under threat of termination and deportation, other SL Alabama employees who were U.S. citizens or nationals, non-Mexican nationals, and/or non-Hispanic were only required to work 40 hours per week without threat of termination. Furthermore, SL Alabama required Mr. Martinez and other TN visa workers to stay and work late if a particular production line had to stay late but employees who were U.S. citizens or nationals, non-Mexican nationals, and/or non-Hispanic employees were allowed to leave work.

405.   During Mr. Gutierrez's employment, he was paid $11.50 per hour.

406.   Mr. Gutierrez worked alongside employees of SL Alabama and was supervised and received instruction on how to perform his job from SL Alabama

supervisors.

407.   These supervisors told Mr. Gutierrez which station to work at, instructed him on how to perform his job, and monitored and corrected his work.

408.   The SL Alabama supervisors directing Mr. Gutierrez's work wore a shirt with an SL Alabama logo.

409.   Mr. Gutierrez was also required to work overtime. He worked 12-hour shifts and six-day workweeks, on the night shift. Occasionally, he was required to work 7 days a week.

410.   He was never put on the schedule for day shift despite his requests to switch shifts.

411.   Defendants SPJ and SL Alabama made it clear to Mr. Gutierrez that the hours and schedule were mandatory.

412.   On several occasions, Iñaki Arenas Zenteno, an HR Assistant Manager at SL Alabama, told Mr. Gutierrez that if he did not work on the weekends, he would be fired or punished.

413.   Mr. Gutierrez also complained many times to Iñaki Arenas Zenteno about the nature of the job he was performing given that he was promised an engineering job, and he also complained about the shift he was working.

414.   In response, Iñaki Arenas Zenteno said the "contract" said TN visa

workers like Mr. Gutierrez were "operators" and doesn't indicate that they were supposed to be engineers. Mr. Gutierrez emphasized to him that he has engineering experience and pleaded with him to work in another position to no avail.

415.   In May 2022, Mr. Gutierrez reached his breaking point and quit his job. He determined he would rather bear the costs and risks of leaving than continue working (a) excessive mandatory overtime, (b) in poor working conditions at a manual labor position that was contrary to what he had been promised (c) for lower pay than he was promised, and (d) under threat of eviction and deportation if he complained.

## Employment Discrimination Allegations

416.   Other employees of Defendants SL Alabama, Allswell, and SPJ who were U.S. citizens or nationals, non-Mexican nationals, and non-Hispanic, perform manual labor in the same or similar positions as Plaintiffs.

417.   All Plaintiffs earned substantially less per hour than employees who were U.S. citizens or nationals, non-Mexican nationals, and non-Hispanic who were in the same or similar positions and employees of Defendant SL Alabama.

418.   Employees of SL Alabama who are U.S. citizens or nationals, non-Mexican nationals, and non-Hispanic are or were not required to work more than 40 hours per week for the same or similar manual labor positions as Plaintiffs.

419.   Mr. Bastidas spoke with American workers at SL Alabama and found out that they earned $18 to $22 per hour for the same or similar manual labor positions, despite working for the company for only a few months.

420.   Mr. Vazquez spoke with American workers at SL Alabama and found out that they earned between $16 to $18 per hour for the same manual labor positions and were not required to work overtime or 6 days per week.

421.   For example, a white male named Tim (last name unknown) and a Black American female named Thela Norris earned at least $16 per hour in the same or similar manual labor positions and were not required to work more than 40 hours per week.

422.   Plaintiffs have spoken with other co-workers at the SL Alabama facility about their compensation and have learned that those employees who were U.S. citizens or nationals, non-Mexican nationals, and non-Hispanic, and who were performing similar production line labor, earn hourly wages up to nearly double the Plaintiffs' wages, with no required overtime.

423.   Plaintiffs also have learned that employees working at the SL Alabama facility who were U.S. citizens or nationals, non-Mexican nationals, and non-Hispanic who perform the same work as Plaintiffs are not required to hold college degrees.

424.   Defendants SL Alabama, Allswell, and SPJ have a pattern and practice of paying employees who are U.S. citizens or nationals, non-Mexican nationals, and non-Hispanic higher wages than employees who are non-U.S. citizens, Hispanic, and of Mexican national origin.

425.   Plaintiffs were discriminated against also because engineers who were U.S. or Korean citizens or nationals, non-Mexican nationals, and non-Hispanic were not required to work manual labor positions at low wages. Instead, such persons were hired in skilled positions, earning higher wages for fewer hours and better working conditions.

**Trafficking Victims Protection Act Violations:**
**Forced Labor, Trafficking for Forced Labor, and Venture Liability**

426.   The TN visa program is a "law or legal process" within the meaning of the forced labor statute, 18 U.S.C. § 1589(a)(3) and (c)(1).

427.   Defendants' fraudulent TN visa scheme was for the purpose of securing skilled technical workers from Mexico to work in unskilled manual labor jobs.  In doing so, Defendants used the law and legal process in a manner and for a purpose for which it was not designed.

428.   Defendants executed their fraudulent TN visa scheme to exert pressure on Plaintiffs and other similarly situated workers to provide manual labor for long hours at lower-than-promised wages.

85

429.   Therefore, Defendants used the law and legal process in a manner and for a purpose for which it was not designed.

430.   Defendants' fraudulent TN visa scheme constituted abuse of law or legal process.

431.   Defendants provided and obtained Plaintiffs' and other similarly situated workers' labor by means of the pressure created by this abuse of law or legal process.

432.   The resulting pressure caused Plaintiffs and other similarly situated workers to work in manual labor jobs for long hours at lower-than-promised wages.

433.   While Plaintiffs were employed at the SL Alabama facility, Younglin Lee, Allswell's President and SPJ's Secretary, yelled at, berated, and threatened the workers.

434.   In April 2021, after Mr. Vazquez, Mr. Bastidas, and other TN visa workers at SL Alabama complained about the hours they were working, the low wages they were being paid, and the manual labor they were required to perform, they were called into a captive-audience meeting with SPJ and Allswell principal Younglin Lee at one of the apartment units at the complex where they lived. Mr. Lee yelled at them. He angrily told them that he had provided them with an opportunity and they had to accept it.

435.   During this meeting, Mr. Lee also threatened Mr. Vazquez, Mr. Bastidas, and other TN visa workers by stating that if anyone left the job, Mr. Lee would notify federal immigration authorities so that the TN visa could be taken away from them and they would be deported. He further intimidated the workers by stating that he knew where they all lived in case they "did anything more"—which Mr. Vazquez and Mr. Bastidas reasonably understood to mean if a complaint or lawsuit was filed.

436.   Mr. Lee proceeded to fire and immediately evict Mr. Bastidas from his apartment for being outspoken with his complaints. However, Mr. Bastidas started crying, and then Mr. Lee rescinded the termination and eviction.

437.   Canceling workers' TN visas, subjecting them to deportation, and eviction each is a "law or legal process" within the meaning of the forced labor statute, 18 U.S.C. § 1589(a)(3) and (c)(1).

438.   Mr. Lee, in his capacity of the principal of SPJ and Allswell and as an agent for SL Alabama, threatened Mr. Vazquez, Mr. Bastidas, and the other TN visa workers with cancelation of their TN visas, deportation, and eviction for the purpose of  preventing these skilled technical workers (a) from complaining about their wages, long work hours, and the manual labor they were required to perform for Defendants; (b) from seeking legitimate employment elsewhere.

439.   Mr. Lee made these threats to exert pressure on Mr. Vazquez, Mr. Bastidas, and other TN visa workers to continue working as manual laborers for long hours at lower-than-promised wages.

440.   Therefore, Defendants used the law and legal process in a manner and for a purpose for which it was not designed.

441.   Defendants obtained Plaintiffs' and other similarly situated workers' labor by means of the pressure created by this abuse of law or legal process.

442.   The resulting pressure caused Plaintiffs and other similarly situated workers to work in manual labor jobs for long hours at lower-than-promised wages.

443.   The Plaintiffs and other similarly situated workers reasonably believed immigration authorities first would detain them before deporting them.

444.   Therefore, Defendants' threats of deportation were threats of physical restraint for the purpose of obtaining Plaintiffs' and other similarly situated workers' labor, within the meaning of the forced labor statute, 18 U.S.C. § 1589(a)(1).

445.   Defendants' threats of deportation also were part of a scheme, plan, or pattern Defendants intended to cause Plaintiffs and other similarly situated workers to believe they would suffer physical restraint if they did not continue working as manual laborers for long hours at lower-than-promised wages. *See* 18 U.S.C. § 1589(a)(4).

446.   Plaintiffs and other similarly situated workers also reasonably believed eviction and deportation would cause them (a) financial harm as a result of becoming unemployed and homeless; loss of the funds they had spent for recruitment, visa, and transportation costs; loss of personal property they had purchased in the United States; (b) psychological harm resulting from the stress and anxiety of homelessness, detention, deportation, and unemployment; and/or (c) reputational harm resulting from the social stigma of homelessness,  detention, deportation, and/or unemployment.

447.   This financial, psychological, and reputational harm was "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

448.   Therefore, Defendants' threats of deportation were threats of serious harm for the purpose of obtaining Plaintiffs' and other similarly situated workers' labor, within the meaning of 18 U.S.C. § 1589(a)(2) and (c)(2).

449.   Defendants' threats of deportation also were part of a scheme, plan, or pattern Defendants intended to cause Plaintiffs and other similarly situated workers to believe they would suffer serious harm if they did not continue working as manual

laborers for long hours at lower-than-promised wages. *See* 18 U.S.C. § 1589(a)(4) and (c)(2).

450.   Mr. Lee has a history of threatening TN visa workers with deportation. TN visa workers in the case *Martinez v. Mobis Alabama, LLC et al.,* Case 3:22-cv-00145-TCB-RGV (N.D. Ga.) (Doc. 74 – Third Amended Complaint), were also threatened by Youngjin Lee. In that case, in or around April 2021, Mr. Lee required a large group of workers to attend a meeting. The meeting was recorded. He had learned some workers were trying to transfer their TN visas to employers with legitimate engineering positions.  He told the workers they would deported if they continued to apply for other jobs. He also admitted that he could go to jail for the working conditions the TN visa workers were experiencing.

451.   Defendants, directly or through their agents, knowingly recruited, transported, provided, and obtained Plaintiffs and other similarly situated workers for forced labor, within the meaning of the trafficking for forced labor statute, 18 U.S.C. § 1590(a).

452.   Defendant SL Alabama benefited financially from its participation in a venture with Defendants SPJ, Allswell, and Youngjin Lee, which SL Alabama knew or should have known was engaged in forced labor and trafficking for forced labor.

453.   SL Alabama's financial benefits included increased profits from, *inter*

*alia*, (1) employing skilled technical workers in manual labor jobs; (2) cost savings from paying the Plaintiffs and other similarly situated workers less than the workers SL otherwise would have employed; and (3) increased productivity arising out of the forced overtime they required Plaintiffs and other similarly situated workers to perform.

454.   Plaintiffs and other similarly situated workers suffered economic injuries and emotional distress as consequences of Defendants' human trafficking scheme.

## RICO VIOLATIONS

455.   Defendants SL Alabama, Allswell, SPJ, and Lee ("the Rico Enterprise") were an enterprise within the meaning of RICO in that they were associated in fact although not a legal entity. 18 U.S.C. § 1962(c).

456.   At all relevant times, the RICO Enterprise existed for the common purpose of securing cheap manual labor to work at the SL Alabama facility and to profit from such labor and the recruitment of such labor.

457.   At all relevant times, the RICO Enterprise was engaged in, or their activities affected, interstate and/or foreign commerce within the meaning of RICO, 18 U.S.C. 1962(c).

458.   The RICO Enterprise is an ongoing organization with a framework,

either formal or informal, for carrying out its common purpose.

459.   The association comprising the RICO Enterprise began in or about November 2020 and was used to defraud Plaintiffs, the U.S. government, and many other foreign workers recruited from Mexico to work for Defendants.

### *Association-in-Fact*

460.   RICO Enterprise members associated with each other for the common purpose of recruiting Mexican engineers and technicians for and employing Mexican engineers and technicians on SL Alabama's assembly production line.

461.   SL Alabama agreed with Allswell, SPJ, and Lee that SPJ would recruit and employ foreign workers to work as laborers on SL Alabama's assembly production line.

462.   SPJ knowingly agreed with SL Alabama to post fraudulent announcements for employment at the SL Alabama plant as engineers or in other positions with education and skill requirements necessary to make foreign workers qualified for TN visas.

463.   In furtherance of the scheme, SL Alabama provided detailed information relating operations at its plant to use during recruitment and to include in the TN visa Support Letters.

464.   SL Alabama agreed to this fraudulent scheme as evidenced by its

signing the Offer Letters and Support Letters, hiring the Plaintiffs and other TN visa workers for non-existent jobs, and jointly employing the Plaintiffs and other TN workers with Allswell and SPJ in jobs that were drastically different than promised to Plaintiffs, the other TN visa workers, and the U.S. government.

465.   The Defendants used the mail and wires, including telephone and video calls, email, text messages, and WhatsApp messages, in furtherance of the foregoing activities. Therefore, the foregoing activities constitute mail and/or wire fraud, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, and damaged Plaintiffs and similarly situated employees.

466.   The agreement between Defendants to conduct this scheme also is evidenced by their knowledge of the TN visa requirements, knowledge that foreign workers must have a visa and work authorization, and their review of TN visa documents with full knowledge that the foreign workers were not performing jobs that qualified for the TN visa.

467.   Defendants agreed to make false representations, through the RICO Enterprise, to the Plaintiffs, among many other similarly situated Mexican workers, that there were high skilled jobs available at SL Alabama requiring the education and skill that would make them eligible for TN visas and entice them to apply, while knowing that these jobs did not exist and that Plaintiffs and others would be working

manual labor production assembly line jobs.

468.   Defendants jointly employed Plaintiffs and other TN visa holders to work at SL Alabama's facility, jointly trained and supervised them during their joint employment, and provided Plaintiffs identification badges or visitor badges to allow them access to the SL Alabama facility.

469.   SPJ, acting as recruiters for SL Alabama, Allswell, and Youngjin Lee, made fraudulent misrepresentations about non-existent jobs and committed overt acts of fraud by (a) collecting information; (b) causing the mail and wires to be used in furtherance of the false and fraudulent statements to the Plaintiffs, the U.S. government, and others; (c) facilitating consular interviews for the Plaintiffs (d) telling the Plaintiffs what to say in their consular interviews (including preparation of the types of questions they would be asked, and the answers to give) and (e) providing other information to SL Alabama.

470.   As part of Defendants' fraudulent misrepresentations, and with the plan and intention of using the same to defraud the U.S. Government in connection with TN visa applications, SL Alabama offered the Plaintiffs and others jobs at SL Alabama as outlined in the Support Letters signed by SL Alabama President, Mr. Choi.

471.   All the Defendants in the RICO Enterprise knew that TN visas would

not and could not be granted for workers to perform the manual labor positions that SL Alabama wanted filled.   This is one reason they concocted their fraudulent scheme.

472.   In a recorded conversation in April 2021, during a meeting with TN visa workers employed by Allswell at another company, Defendant Lee, who had signed Support Letters for many of Defendants' TN visa workers for that company, conceded that engineers make "20, 25, 30 dollars an hour" but that, if they wanted to be placed in an engineer position, they first needed to build up their skills doing manual labor at the plant.  *Martinez v. Mobis Alabama, LLC et al.,* Case 3:22-cv-00145-TCB-RGV (N.D. Ga.) (Doc. 74, paragraph 632).

473.   Mr. Lee further admitted that he could go to jail for the working conditions the TN visa workers experienced. *Id.*, paragraph 634.

474.   Mr. Lee also told the TN visa workers at that company that he would get them prosecuted and deported for immigration violations, which he could only threaten to do because of his knowledge that they were not performing the work eligible for the TN visa.

475.   Knowing that TN visas would be granted only for professional foreign workers for professional-level job positions, all Defendants in the RICO Enterprise agreed that SPJ and SL Alabama (1) would recruit high skilled Mexican and

Hispanic engineers and technicians for SL Alabama who satisfied the TN visa requirements; and (2) would misrepresent the production line labor positions (which did not qualify the men for TN visas) as professional-level engineering and technician job positions (which did qualify for TN visas).

476.  SL Alabama, SPJ, and Allswell further agreed that Allswell would provide housing and utilities for the recruited workers.

477.  The plan continued with SPJ vetting the Plaintiffs and other candidates, obtaining their resumes, proof of technical or bachelor's degrees, and checking their educational background and engineering and/or technician skills.

478.  The plan continued with SPJ coordinating the interviews with Plaintiffs and SL Alabama.

479.  The plan continued with SL Alabama and SPJ conducting interviews and confirming that Plaintiffs and other foreign workers were in fact highly skilled and highly educated, and concealing the nature of the job positions available for Plaintiffs and other foreign workers.

480.  The plan continued with SL Alabama preparing, and SPJ providing, fraudulent TN visa Support Letters to the Plaintiffs and other foreign workers that mispresented the job positions, duties, and pay so that the job positions met the requirements for TN visas and so that Plaintiffs and other foreign workers would

accept the job positions and apply for TN visas, to their detriment.

481.   The plan continued with SPJ providing the Plaintiffs and other workers directions on how to prepare for and answer questions during their consular interviews so that they could obtain TN visas.

482.   At the time that SPJ and SL Alabama provided the fraudulent TN visa Support Letters to the Plaintiffs and other foreign workers, offering them an engineer or technician position, all the Defendants in the RICO Enterprise knew that the letters included false descriptions of the positions available for the Plaintiffs and other workers, false descriptions of the pay to the Plaintiffs and other foreign workers, and other false information.

483.   The fraudulent TN visa Support Letters were directed to the United States consulate and were part of these Defendants' scheme, through the RICO Enterprise to commit visa fraud, mail and wire fraud, and fraud in foreign labor contracting.

484.   At all relevant times, Youngjin Lee controlled and directed the fraudulent activities of SPJ and Allswell.

### *Participation in the Operation and Management of the Enterprise's Affairs*

485.   SL Alabama directed SPJ to post job announcements for positions of employment at the SL Alabama plant which would, by reason of the education,

experience, and skill required, qualify the successful applicant to obtain a TN visa.

486.   SL Alabama, SPJ, Allswell, and Lee developed a strategy to recruit and house foreign workers who might be qualified for the TN visa, by identifying appropriate websites and other locations in which to post announcements for jobs at SL Alabama that would be seen and responded to by qualified Mexican nationals.

487.   SPJ then executed that strategy, communicating with the Plaintiffs and other potential targets of the fraud scheme to screen them for employment with SL Alabama, checking their educational background and engineering or technician qualifications, and preparing them for their consular interviews.

488.   SPJ accepted the directives of SL Alabama and provided information concerning the positions at SL Alabama to individuals who responded to the announcements they posted.

489.   SL Alabama made false statements and fraudulent misrepresentations to the candidates during their job interviews.

490.   SL Alabama and SPJ decided which candidates to hire.

491.   SL Alabama prepared Support Letters for candidates to secure TN visas for them to work at its facility.

492.   SPJ provided those Support Letters to the Plaintiffs. The Support Letters offered each Plaintiff a job at SL Alabama.

493.   SPJ and SL Alabama provided the fraudulent Support Letters to the U.S. Consulate on behalf of their respective companies and the hired candidates.

494.   Throughout Plaintiff's employment, Plaintiffs and other similarly situated Mexican engineers paid for and received housing and utilities provided by Allswell and SPJ.

495.   Throughout Plaintiffs' employment, Allswell and SPJ instructed them on terms and conditions of their employment through Defendant Youngjin Lee and others, with SL Alabama retaining substantial control over the terms and conditions of their employment.

### Pattern of Continuous Coordinated Conduct

496.   As shown by the fact that Plaintiff Martinez viewed a Facebook post by SPJ for an engineering job as early as November 2020 and was subsequently placed at a TN-visa qualifying job at SL Alabama, the pattern of continuous coordinated conduct by the RICO Enterprise began at least as early as November 2020.

497.   SPJ and Allswell continue to recruit and house Mexican nationals to work in the United States with TN visas at least until the time of the filing of the original Complaint.

498.   SPJ's Facebook pages continue to post on social media to recruit TN visa applicants for positions SPJ claims are engineering jobs.

499.   TN visa workers continue to work at SL Alabama through the time of the filing of this Complaint.

500.   SL Alabama continues its illegal scheme by continuing to employ workers under the TN visa program who are highly skilled but employed in manual labor low-skilled positions and at lower pay than the American workers.

501.   All Defendants in the RICO Enterprise continue to participate in and profit from this illegal scheme.

502.   Defendants in the RICO Enterprise recruited hundreds of foreign workers under the TN visa program through this scheme to advertise false job openings, make false job offers, submit false TN visa Support Letters, induced the foreign workers to come to the U.S. for non-existent jobs, and required the foreign workers to work in manual labor positions for long hours at lower pay than promised, discriminatory pay as compared with others, and pay that violated the FLSA.

503.   The TN visa is tied to the associated employer for the duration of the TN visa period, unless a different employer submits a Petition for Nonimmigrant Worker (USCIS Form I-129) to USCIS seeking to add or change employers. 8 C.F.R. § 214.6(i)(1). Thus, Defendants in the RICO Enterprise necessarily must continue the fraud against the U.S. Government when they seek to renew their employees' TN visas at the end of the one- or three-year visa period.

504.   Upon information and belief, Defendants in the RICO Enterprise continue to recruit Mexican nationals to work with TN visas at SL Alabama for jobs that are not actually eligible for TN visas.

### *Racketeering Activity through Numerous Predicate Acts of Fraud*

505.   As part of a scheme or artifice to defraud, Defendants in the RICO Enterprise caused to be transmitted by mail and/or wires the job announcements used to recruit candidates like the Plaintiffs for employment with SL Alabama.

506.   The job announcements posted by Defendants in the RICO Enterprise contained material misrepresentations upon which the Plaintiffs who viewed them and others relied to their detriment, constituting violations of 18 U.S.C. § 1341 and/or § 1343.

507.   As part of a scheme or artifice to defraud, Defendants in the RICO Enterprise caused to be transmitted by mail and/or wires the offer letters which offered non-existent jobs at SL Alabama to the Plaintiffs and others.

508.   The job titles and positions in the offer letters were material misrepresentations upon which the Plaintiffs and others relied to their detriment, constituting violations of 18 U.S.C. § 1341 and/or § 1343.

509.   As part of a scheme or artifice to defraud, Defendants in the RICO Enterprise caused to be transmitted to the Plaintiffs by mail and/or wires Support

Letters, addressed to the U.S. Government, regarding the jobs to be performed by Plaintiffs and others.

510.   Defendants in the RICO Enterprise made material misrepresentations in the statements of fact submitted to the U.S. Government, and the U.S. Government relied on those statements in issuing TN visas to Plaintiffs and others, constituting violations of 18 U.S.C. § 1341 and/or §1343 and §1546.

511.   As part of a scheme or artifice to defraud, Defendants SPJ and SL Alabama used materially false or fraudulent representations or promises regarding employment offered to the Plaintiffs and others knowingly and with the intent to defraud, in violation of 18 U.S.C. § 1351.

512.   As part of a scheme or artifice to defraud, Defendants in the RICO Enterprise used false attestations to secure work authorization for the Plaintiffs and others and/or knowingly subscribed as true false statements concerning the jobs to be performed by the Plaintiffs and others, as well as other false statements concerning the terms and conditions of the Plaintiffs' and others' employment, as set forth in Plaintiffs' Statement of Facts, above, which were material facts in an application, affidavit, or other document submitted for use in immigration proceedings to obtain a visa, constituting a violation of 18 U.S.C. § 1546.

513.   Defendants in the RICO Enterprise each knowingly and with the intent

to defraud recruited, solicited, and hired the Plaintiffs and other foreign workers for purposes of employment by means of false and fraudulent pretenses, representations and promises regarding the employment, in violation of 18 U.S.C. § 1351.

514.   Defendants knowingly and with the intent to defraud recruited, solicited, and hired the Plaintiffs and other foreign workers for purposes of employment by means of false and fraudulent pretenses, representations and promises regarding the employment, in violation of 18 U.S.C. § 1351.

515.   Defendants used false attestations and provided fraudulent TN visa Support Letters to the U.S. government for purposes of committing visa fraud in violation of 18 U.S.C. § 1546; *see e.g., U.S. v. Wu*, 2022 WL 4461376, at *3 (9th Cir. Sept. 26, 2022).

516.   Defendants, through the RICO Enterprise, and as set forth in the above paragraphs, committed forced labor and trafficking for forced labor in violation of 18 U.S.C. §§ 1589 and 1590, and SL Alabama benefited financially from participating in a venture it  knew or should have known was engaged in forced labor and trafficking for forced labor.

### *Plaintiffs' Pecuniary Injuries Directly and Proximately Caused by the Pattern of Racketeering Activity*

517.   Defendants knowingly and through fraudulent conduct induced the Plaintiffs and other foreign workers to unknowingly pay for and apply for a

fraudulent TN visa, to travel to the United States for a job that did not exist, and to accept employment at terms that were less than promised.

518.   SL Alabama did not pay the Plaintiffs and other foreign workers the salary promised in the second offer letter or in the Support Letter provided to the Plaintiffs and the U.S. government.

519.   Plaintiffs and other TN visa foreign workers suffered pecuniary losses that were directly and proximately caused by the fraudulent job postings for positions with SL Alabama, the application and related information provided to them by Defendants in the RICO Enterprise, the offer letters provided to them by Defendant SPJ and SL Alabama, and the Support Letter provided to them and the U.S. Consulate by SPJ and SL Alabama, the resulting TN visas issued to them, and the forced labor and trafficking for forced labor, including but not limited to:

> a.   Travel costs to and from the U.S. consulate for the mandated TN visa interview;
>
> b.   U.S. Government visa processing fees of $160 per visa;
>
> c.   Unreimbursed expenses for travel to the U.S. to work for SL Alabama and return travel to Mexico;
>
> d.   Costs to purchase essential furniture and household goods upon arrival at housing provided by Allswell; and

e.    Lost wages in the form of the difference between the wages promised and the lower wages actually paid.

520.    These pecuniary losses and others would not have been suffered but for the material misrepresentations made to the Plaintiffs and others as part of the scheme to defraud them and the U.S. Government to secure recruit the Plaintiffs and others for jobs that did not exist, and the forced labor and trafficking for forced labor committed against Plaintiffs and others.

## The RICO Conspiracy

521.    Plaintiffs plead the existence of a RICO Conspiracy as well.

522.    Defendants SL Alabama and SPJ agreed that SPJ would post multiple fraudulent job announcements using wires; that SPJ would send multiple fraudulent job offers for non-existent jobs to multiple different candidates; that SPJ would send fraudulent Support Letters to Plaintiffs and others and the U.S. Government, and that Allswell, SPJ, and Lee would assist SL Alabama with supervising, managing, and directing Plaintiffs and others to perform jobs that were not the jobs promised to them in the job announcements and correspondence, all of which constitute multiple predicate acts of mail and/or wire fraud in violation of 18 U.S.C. § 1341 and/or § 1343, labor contracting fraud in violation of 18 U.S.C. § 1351, misuse of visas in violation of 18 U.S.C. § 1546; and forced labor in violation of the TVPA.

523.   At the same time, Defendants SL Alabama, Allswell, and SPJ engaged in this pattern of racketeering activity through the RICO Enterprise. Defendants SL Alabama (a) retained the services of Defendants Allswell, SPJ, and Lee to engage in the same scheme to defraud Mexican engineers and the U.S. government for the same common purpose, and (b) Allswell, SPJ, and Lee all took affirmative steps, including coordinating communications with Mexican engineers, holding leases for apartments and utility accounts for the purpose of providing housing to the Plaintiffs and others during their employment in manual labor jobs which did not qualify for the TN visa program, and providing information and direction to them concerning the terms and conditions of their employment in those jobs.

524.   Defendants all conspired with each other by adopting the goal of furthering and participating in the objectives of the RICO Enterprise to engage in a fraudulent scheme.

## CLASS ACTION ALLEGATIONS

525.   Plaintiffs bring their federal and Georgia RICO claims, their contract claims, and their TVPA claims, on behalf of themselves and a class of persons ("the Recruitment Class") consisting of:

> All individuals who, between October 25, 2019 and the present, (1) were recruited by SPJ, (2) were employed at the SL Alabama plant, (3) received wages from SL Alabama; and (4) were TN visa holders.

106

526.   The SL Alabama Claimants bring their Section 1981 claims on behalf of a subclass of persons ("the Discrimination Class") consisting of:

> All individuals who, between October 25, 2019 and the present, (1) were recruited by SPJ, (2) were employed at the SL Alabama production facility, (3) received wages from SL Alabama; and (4) were non-white Hispanic or Latino, non-U.S. citizens, and of Mexican national origin.

527.   Excluded from the Classes are the legal representatives, officers, directors, assigns, and successors of Defendants; any individual who at any time during the Class periods has had a controlling interest in any Defendant; and all persons who submit timely and otherwise proper requests for exclusion from the Classes.

### *Numerosity*

528.   There are over 100 individuals who are members of each Class and based on the number of individuals with TN visas hired to work at the SL Alabama plant.

529.   The members of the Classes are sufficiently numerous that joinder of all members is impractical.

### *Existence and Predominance of Common Questions*

530.   Common questions of law and fact exist as to Plaintiffs and members of the Classes and predominate over questions affecting only individual Class and

Subclass members.

531.   These common questions include:

    a.    whether Defendants conspired to violate the federal and Georgia RICO;

    b.    whether Defendants, through a RICO Enterprise, committed a pattern of racketeering activity causing Plaintiffs and other TN visa holders to suffer pecuniary losses;

    c.    The nature and extent of class-wide injury and the measure of damages for those injuries;

    d.    Whether Defendants breached contractual promises to Plaintiffs and others to provide employment with job duties requiring engineering and/or technical education, experience, and skill at salaries presented in the Support Letters;

    e.    Whether Defendants unlawfully discriminated against the putative Discrimination Class by paying them less than, requiring them to work longer than, and/or subjecting them to harsher discipline than U.S. citizens or nationals, non-Mexican nationals, and non-Hispanic workers.

f.  Whether Defendants' actions were undertaken knowingly, willfully, intentionally, and without justification to deprive the putative Discrimination Class Members of their rights, and/or whether Defendants acted intentionally and with malice or reckless indifference to the federally protected rights of the Discrimination Class members;

g.  Whether Defendants provided and obtained Plaintiffs' and others' labor by means of a fraudulent scheme that constituted abuse of legal process;

h.  Whether Defendants used threats of physical restraint, serious harm, and/or abuse of the law or legal process, to coerce Plaintiffs and others to remain employed by Defendants;

i.  Whether Defendants recruited, transported, provided, and/or obtained Plaintiffs' and others for forced labor.

j.  Whether SL Alabama knowingly benefited financially from participation in a venture SL Alabama knew or should have known was engaged in forced labor and trafficking for forced labor; and

       k.    The nature and extent of class-wide injury and the measure of damages for those injuries.

### *Typicality*

532.   Plaintiffs and Members of the Classes have all been subject to the same unlawful practices of Defendants, and their claims arise out of these same practices.

533.   Plaintiffs and members of the Classes have the same rights under applicable laws.

534.   Plaintiffs and members of the Classes were recruited and employed under the same or similar circumstances giving rise to the same claims.

535.   Plaintiffs and members of the Classes suffered similar types of pecuniary damages.

536.   Plaintiffs' claims are typical of the claims of the Recruitment Class because, among other things, they (a) were the victims of fraudulent promises regarding the jobs they would perform at the SL Alabama facility, (b) performed jobs that were not what they were promised or at the rate of pay promised, and (c) were the victims of abuse of the law or legal process and threats of abuse of the law or legal process, physical restraint, and serious harm to coerce Plaintiffs and others to remain employed by Defendants.

537.   Plaintiffs' claims are typical of the claims of the Discrimination Class

because, among other things, they (a) were TN visa holders; (b) are non-white Hispanic or Latino, non-U.S. citizens, and of Mexican national origin; and (c) were employees who worked for SL Alabama and SPJ and suffered the same violations as the proposed Discrimination Subclass members.

538.   Plaintiffs' interests are co-extensive with the interests of the Class members; Plaintiffs have no interest adverse to the Class or Subclass members.

539.   Plaintiffs and the Classes were offered and did accept the same terms and conditions of employment which Defendants are alleged to have breached.

### *Adequacy*

540.   Plaintiffs will fairly and adequately represent the interests of the Classes members. Their interests do not conflict with the interests of the members of the Class and Subclasses they seek to represent.

541.   Plaintiffs understand that, as Class representatives, they assume a responsibility to the Classes to represent their interests fairly and adequately.

542.   Plaintiffs have retained counsel experienced in prosecuting class actions and in employment matters. There is no reason why Plaintiffs and their counsel will not vigorously pursue this matter.

### *Superiority*

543.   A class action is superior to other available means for the fair and

efficient adjudication of the claims at issue herein.

544.   The damages suffered by each individual member of the Classes may not be sufficient to justify the burden and expense, particularly in light of the transnational nature of this case, of individual prosecution of the litigation necessitated by Defendants' conduct.

545.   Further, it would be difficult for members of the Classes to obtain individual redress effectively for the wrongs done to them. If individual actions were to be brought by each member of the Classes, the result would be a multiplicity of actions, creating hardships for members of the Classes, the Court, and Defendants.

546.   Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the Court system.

547.   By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

548.   This case does not present individualized factual or legal issues which would render a class action difficult.

549.   In the alternative, the Class may be certified because: (a)   the prosecution of separate actions by the individual members of the Classes would

create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for Defendants; (b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the members of the Class and Subclasses as a whole.

## FLSA COLLECTIVE ACTION ALLEGATIONS

550. Plaintiffs and other similarly situated TN visa workers regularly worked at the SL Alabama plant in excess of 40 hours per week ("overtime") for the duration of their employment.

551. During Plaintiffs' and other similarly situated TN visa holders' employment, Allswell provided them with housing.

552. As set forth in the offer letters and Support Letters provided to Plaintiffs, housing accommodations and transportation assistance were regarded as part of Plaintiffs' and other similarly situated workers' compensation.

553.   When calculating overtime wages, SL Alabama and Allswell did not include in the regular rate of pay the reasonable cost to Defendants or the fair value of the housing or transportation assistance. 29 C.F.R. § 778.116.

554.   Additionally, as a condition of obtaining their employment with the Defendants, Plaintiffs and other similarly situated TN visa holders were required to incur the cost of their TN visas and inbound and outbound travel expenses, which primarily benefitted Defendants, and were not fully reimbursed in Plaintiffs' first and/or final workweeks, effectively reducing Plaintiffs' wages below their required overtime rates of pay.

555.   Therefore, Defendants did not pay Plaintiffs and other similarly situated TN visa holders overtime wages at a rate of one-and-one-half their regular rate of pay, as required by the FLSA. 29 U.S.C. § 207(a).

556.   The actions and omissions alleged above were willful in that Defendants were aware of their obligations regarding overtime wages, showed reckless disregard for whether their conduct violated the FLSA, or acted without a reasonable basis to believe their actions were in compliance with the FLSA.

557.   Plaintiffs and other TN visa holders were subject to the same policies and practices of the Defendants.

558.   Common proof applicable to Plaintiffs and the other TN visa holders

will show that the Defendants failed to properly pay required overtime and/or minimum wages.

559.   Plaintiffs are currently unaware of the identities of all the employees who would be members of the FLSA opt-in class, but this information is readily ascertainable from the Defendants' records.

560.   Defendants therefore should be required to provide Plaintiffs with a list—including last known addresses, telephone numbers, and email addresses if known—of all individuals who were TN visa holders employed at the SL Alabama plant between October 25, 2019 and the present.

561.   For purposes of the FLSA, Plaintiffs bring this suit on behalf of themselves and the following two classes of similarly situated workers:

a.   All current and former TN visa employees who worked at SL Alabama within the three-year period before the filing of this Complaint, who elect to opt-in to this action under the FLSA, 29 U.S.C. § 216(b), and were:

i.   paid a regular rate that did not include the fair value of housing and transportation assistance provided;

ii.   not reimbursed in full for inbound or outbound visa and travel costs; or

115

iii.    otherwise deprived of minimum or overtime wages.

## COUNT I
**Trafficking Victims Protection Act**
**Class Claim**
*All Plaintiffs against All Defendants*

562.   Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

563.   This cause of action sets for Plaintiffs' and other Class members' claims against Defendants under the civil remedies provision of the TVPA, 18 U.S.C. § 1595, in that:

a.    Plaintiffs are a victim of violations of the following provisions of Title 18, Chapter 77 of the United States Code: 18 U.S.C. §§ 1589 and 1590;

b.    Defendants were perpetrators of the foregoing violations; and

c.    Defendant SL Alabama knowingly benefited financially from participation in a venture it knew or should have known engaged in the foregoing violations. *See* 18 U.S.C. § 1595(a).

564.   In violation of 18 U.S.C. § 1589, Defendants knowingly provided and obtained Plaintiffs' and other Class members' labor or services by means of:

a.    Threats of physical restraint;

b.    Threats of serious harm;

116

    c.      Abuse of legal process and threats of abuse of legal process;

    d.      A scheme, plan, or pattern intended to cause Plaintiffs to believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint.

565.   In violation of 18 U.S.C. § 1590, and in addition to the violations of 18 U.S.C. § 1589 set forth above, Defendants, directly or through their agents, knowingly recruited, transported, provided, and obtained Plaintiffs and other Class members for labor or services in furtherance of the Defendants' violations of 18 U.S.C. § 1589.

566.   SL Alabama knowingly benefitted financially by participating in a venture with SPJ, Allswell, and Lee, which SL Alabama  knew or should have known engaged in the foregoing violations of 18 U.S.C. §§ 1589 and 1590.

567.   Defendants are liable for the foregoing TVPA violations, as set forth in 18 U.S.C. § 1595(a).

568.   Defendants' acts and omissions giving rise to this claim showed willful misconduct, malice, fraud, wantonness, oppression, and entire want of care, giving rise to a presumption of conscious indifference to the consequences.

569.   Under the TVPA, Plaintiffs and other Class members are entitled to recover compensatory and punitive damages in an amount to be proven at trial,

including but not limited to:

    a.    compensation at the promised wage rate including all applicable overtime wages for the work done while employed by Defendants;

    b.    other compensatory damages, including compensation for physical and emotional injuries;

    c.    compensation for all moneys paid during the recruitment process and in order to come to the United States to work, including travel and visa expenses;

    d.    punitive damages; and

    e.    attorneys' and experts' fees and costs as authorized by 18 U.S.C. § 1595.

## <u>COUNT II</u>
**Racketeer Influenced and Corrupt Organizations Act,**
**18 U.S.C. § 1961-68**
**Class Claim**
***All Plaintiffs against All Defendants.***

570. Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

571. This Count sets forth claims by Plaintiffs and other members of the Recruitment Class against all Defendants for damages resulting from Defendants'

violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961-68.

572. Each Plaintiff is a "person" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

573. Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

574. The RICO Enterprise, as defined above, is an association-in-fact enterprise with the common purpose of securing cheap manual labor to work at SL Alabama plant in violation of the immigration laws, and to profit from such labor.

575. The RICO Enterprise engaged in and affected interstate commerce.

576. The RICO Enterprise functions as a continuing unit.

577. Defendants conducted or participated—and/or conspired to do so—in the affairs of the RICO Enterprise, through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and/or 18 U.S.C. § 1962(d), related by their common purpose.

578. Each of the Defendants also participated in the operation or management of the respective enterprise itself, directing the activity of the enterprise.

579. Specifically, Defendants conducted or participated and/or conspired to

do so in the affairs of the respective RICO Enterprise by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

    a.      TVPA in violation of 18 U.S.C. §§ 1589 and 1590;

    b.      Mail fraud in violation of 18 U.S.C. § 1341;

    c.      Wire fraud in violation of 18 U.S.C. § 1343;

    d.      Fraud in foreign labor contracting in violation of 18 U.S.C. § 1351; and

    e.      Visa Fraud in violation of 18 U.S.C. § 1546.

*Predicate Acts*

Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343

580. As set forth in the preceding paragraphs, Defendants, through the RICO Enterprise, made—and/or conspired to make—material misrepresentations to the U.S. Government and to TN visa applicants regarding the nature of Plaintiffs' and other Recruitment Class members' work, the hours they would work, and the wages they would receive.

581. As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprise, used and/or conspired to use the mails and wire communications, including communications via telephone, fax, internet, and/or email, on numerous occasions to further these fraudulent schemes.

582. These willful, knowing, and intentional acts constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

<u>Fraud in Foreign Labor Contracting: 18 U.S.C. § 1351</u>

583. As set forth in the preceding paragraphs, Defendants, through the RICO Enterprise, knowingly and with intent to defraud, recruited, solicited, and hired Plaintiffs and other Recruitment Class members outside the United States—and/or conspired to do so—for the purpose of employment in the United States by means of materially false or fraudulent pretenses, representations, or promises regarding the nature of Plaintiffs' and other Recruitment Class members' work, the hours they would work, and the wages they would receive.

584. These willful, knowing, and intentional acts constitute fraud in foreign labor contracting in violation of 18 U.S.C. § 1351.

<u>Fraud and Misuse of Visas: 18 U.S.C. § 1351</u>

585. As set forth in the preceding paragraphs, Defendants, through the RICO Enterprise, knowingly used, attempted to use, possessed, and received - and/or conspired to do so - TN visa application documents seeking authorization for Plaintiffs and other Recruitment Class members to work in the U.S. and TN visas issued to those individuals, which were procured by means of false claims or statements, and/or otherwise procured by fraud or unlawfully obtained, and

Defendants also knowingly presented false statements in applications, affidavits, and/or other documents in support of such visa applications, knowingly causing the U.S. Government to issue TN visas to Plaintiffs and others which would not have been issued but for the false statements concerning the work to be performed by Plaintiffs and others at SL Alabama.

586.   These willful, knowing, and intentional acts constitute fraud and misuse of visas, permits, and other documents in violation of 18 U.S.C. § 1351.

<u>TVPA Violations: 18 U.S.C. §§ 1589, 1590, and 1595</u>

587.   As set forth above, the Defendants, through the RICO Enterprise, knowingly provided and obtained Plaintiffs' and other Class members' labor or services, and subjected them to forced labor in violation of 18 U.S.C. § 1589; recruited, transported, provided, and obtained Plaintiffs' and other Class members for the purpose of forced labor in violation of 18 U.S.C. § 1590, and SL Alabama knowingly benefited financially from participation in a venture it  knew or should have known was engaged in forced labor and trafficking for forced labor, as set forth in 18 U.S.C. § 1595.

## *Pattern of Related Racketeering Acts*

588.   Defendants engaged in the racketeering activity described in this claim repeatedly from on or about November 2020 through the present.

589.   The pattern affected hundreds of individuals, accomplishing its fraudulent purposes on the U.S. Government and foreign workers who came to work for Defendants on dozens of occasions during the period of the pattern of racketeering acts.

590.   Defendants, through the RICO Enterprise, rely on the racketeering acts described in this Complaint to conduct their regular business activities.

591.   Defendants' racketeering acts have or had similar purposes: to profit from the fraud Defendants committed in the contracting, hiring, and employment of Plaintiffs and other Recruitment Class members.

592.   Each of the Defendants' acts yielded similar results and caused similar injuries to Plaintiffs and other Recruitment Class members, including underpayment of wages, lost employment opportunities, and out-of-pocket costs associated with the recruitment and visa application process.

593.   As set forth in the preceding paragraphs, the racketeering acts have or had similar participants: the Defendants and their agents.

594.   As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprise, directed their racketeering activities at similar individuals and entities: Plaintiffs and other Recruitment Class members, and federal government agencies.

595.   The Defendants' acts have or had similar methods of commission, such as common recruitment tactics and use of similar employment practices and policies with respect to Plaintiffs and other Recruitment Class members.

<u>Conspiracy</u>

596.   As set forth above, Defendants conspired to violate the RICO, by agreeing to participate in the objectives of the Enterprise to engage in the pattern of racketeering activity.

<u>Injury and Remedies</u>

597.   As a direct and proximate result of the Defendants' willful, knowing, and intentional acts discussed in this section, Plaintiffs and Recruitment Class members have suffered injuries to their property, including but not limited to visa processing fees, unreimbursed travel expenses, incidental relocation expenses, wage underpayments, lost employment opportunities, and/or other pecuniary losses.

598.   Plaintiffs and other Recruitment Class members are entitled to an award of damages in an amount to be determined at trial, including but not limited to:

a. compensation for their injuries to their property;

b. trebling of the damages set forth in subparagraph (a), *supra*; and

c. attorneys' and experts' fees and costs associated with this action, as authorized by 18 U.S.C. § 1964(c).

599.   Plaintiffs are entitled to recover their reasonable attorney's fees and costs of litigation.

**COUNT III**
**Georgia Racketeer Influenced And Corrupt Organizations Act,**
**Ga. Code. Ann. § 16-14-1 *et seq.***
**Class Claim**
***All Plaintiffs against All Defendants.***

600.   Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

601.   This Count sets forth Plaintiffs' and Recruitment Class members' claims for damages against all Defendants caused by all Defendants' violations of the Georgia RICO.

602.   Each Plaintiff is an aggrieved person with standing to sue within the meaning of Georgia RICO, O.C.G.A. § 16-14-6(b).

603.   Each Plaintiff is a person who was injured by reason of violations of O.C.G.A. § 16-14-4, and therefore, Plaintiffs have standing to sue pursuant to Georgia RICO, O.C.G.A. § 16-14-6(c).

604.   Defendants are associated in fact although not a legal entity, and therefore are a RICO enterprise, as defined above, within the meaning of O.C.G.A. § 16-14-3(3).

605. The RICO Enterprise, as defined above, is an association-in-fact enterprise with the common purpose of securing cheap manual labor to work at the SL Alabama plant in violation of the immigration laws, and to profit from such labor.

606. The RICO Enterprise functions as continuing units.

607. Defendants were employed by or associated with the RICO Enterprise and conducted or participated in the RICO Enterprise – and/or conspired to do so – through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(b) and 16-14-4(c), related by their common purpose of securing cheap manual labor to work at the SL Alabama plant, and to profit from such labor.

608. Specifically, the predicate acts of racketeering activity by which the Defendants committed the Georgia RICO violations set forth in the preceding paragraphs, are the following:

a. Mail fraud in violation of 18 U.S.C. § 1341;

b. Wire fraud in violation of 18 U.S.C. § 1343;

c. Fraud in foreign labor contracting in violation of 18 U.S.C. § 1351;

d. Visa Fraud in violation of 18 U.S.C. § 1546;

e. False Statements and Writings in violation of O.C.G.A. § 16-10-20; and

f. Forced labor and trafficking for forced labor in violation of the TVPA,

18 U.S.C. §§ 1589 and1590.

609.   Defendants used proceeds derived from the racketeering activity –
and/or conspired to do so – to acquire and maintain interest in money.

*Predicate Acts*

Conduct Defined as "Racketeering"

610.   As set forth in the preceding paragraphs, Defendants, through the RICO
Enterprise, committed and/or conspired to commit, mail and wire fraud in violation
of 18 U.S.C. §§ 1341 and 1343; fraud in foreign labor contracting, in violation of 18
U.S.C. §§ 1351; visa fraud in violation of 18 U.S.C. § 1546; and forced labor and
trafficking for forced labor in violation of 18 U.S.C. §§ 1589 and 1590.

False Statements and Writings in violation of O.C.G.A. § 16-10-20

611.   As set forth in the preceding paragraphs, Defendants, through the RICO
Enterprise, did or conspired to knowingly and willfully falsify material facts and
make false, fictitious, or fraudulent statements or representations regarding the
wages Plaintiffs would receive and the work Plaintiffs would perform.

612.   These knowing and willful acts constituted false statements in violation
of O.C.G.A. § 16-10-20.

*Pattern of Related Racketeering Acts*

613.   Defendants engaged in the racketeering activity described in this

127

lawsuit repeatedly, starting during or before November 2020, and continuing through the present.

614.   Defendants, through the RICO Enterprise, and/or conspiring with the RICO Enterprise, relied on and profited from the racketeering acts described in this Complaint to conduct their regular business activities.

615.   Defendants' racketeering acts have had similar purposes: to profit from fraudulent recruitment of Plaintiffs and other foreign workers, and profit from cheap labor in violation of immigration law.

616.   Each of the Defendants' acts yielded similar results and caused similar injuries to Plaintiffs, as outlined below.

617.   As set forth herein, each of the Defendants agreed to commit more than two predicate acts, including, but not limited to:

      a.    SL Alabama directed Lee, SPJ, and Allswell to—and agreed that SPJ and Allswell would—post jobs offers for employment at SL Alabama that contained fraudulent misrepresentations regarding non-existent jobs, which Plaintiffs and others relied upon;

      b.    Lee, SPJ, and Allswell agreed to post job offers for employment at SL Alabama that contained fraudulent misrepresentations

regarding non-existent jobs, which Plaintiffs and others relied upon;

c.     SPJ coordinated interviews;

d.     SL Alabama and SPJ interviewed Plaintiffs and others using wires and made fraudulent misrepresentations to them for the purpose of enticing them to apply for employment at SL Alabama and SPJ which did not exist and was not eligible for a TN visa;

e.     SPJ offered employment to Plaintiffs and others on the basis of fraudulent misrepresentations, and sent Plaintiffs and others offer letters containing fraudulent misrepresentations regarding non-existent jobs using mails and/or wires;

f.     SL Alabama agreed that SPJ and Allswell would—and they did—use the mail and/or wires to send the offer letters containing fraudulent misrepresentations regarding non-existent jobs to the Plaintiffs and other claimants;

g.     SL Alabama prepared and SPJ submitted Support Letters falsely and fraudulently certifying the nature of the jobs being offered

and the wages that would be paid to Plaintiffs and others at SL Alabama;

h.   SL Alabama provided, and/or agreed to the provision of, the false information contained in the Support Letters for the purpose of defrauding Plaintiffs and the U.S. Government to secure cheap labor in violation of immigration law at the SL Alabama plant after Plaintiffs obtained TN visas and began working for the companies;

i.   SPJ submitted the false and fraudulent Support Letters to the U.S. Government for the purpose of defrauding the U.S. Government and inducing it to issue TN visas to Plaintiffs and others for jobs that did not qualify for the TN visa program;

j.   SL Alabama's human resources departments had actual knowledge that Plaintiffs and others were permitted to work in the United States only pursuant to TN visas and knowingly hired them for positions that did not qualify for the TN visa program in violation of federal law;

k.   SL Alabama and SPJ were joint employers that knowingly hired (and continued to hire) the Plaintiffs and other claimants to work

in job positions that were contrary to their job titles in the offer letters, contrary to the jobs and salaries identified in the TN visa Support Letters, and contrary to the requirements of the TN visa program;

l.     SPJ and Allswell controlled Plaintiffs' housing and utilities by, among other things, not allowing them to move from the housing, and directing Plaintiffs to pay the company's electricity bills to the utility provider;

m.    SL Alabama authorized, requested, participated in, and recklessly tolerated the fraudulent conduct of Allswell and SPJ to secure cheap labor from Plaintiffs and Recruitment Class members in violation of the TN visa program;

n.     SPJ, Lee, and Allswell managed Plaintiffs and other TN visa workers to secure their silence and continue work through threats and intimidation to ensure that the conspiracy and scheme could continue without governmental influence or publicity;

o.     Youngjin Lee directed and controlled all acts by Allswell and SPJ in furtherance of the RICO Enterprise and fraudulent scheme;

p.  Defendants provided and obtained Plaintiffs' and other TN visa workers' labor through abusing the TN visa law and legal process, pressured Plaintiffs and other TN visa workers to continue working through threats of eviction, detention, and deportation; and

q.  Defendants recruited, transported, provided, and obtained Plaintiffs' and other TN visa workers' labor for the purpose of forced labor.

<u>*Injury and Remedies*</u>

618.  As a direct and proximate result of the Defendants' willful, knowing, and intentional acts in violation of Georgia RICO set forth in this complaint, Plaintiffs and Recruitment Class members have suffered injuries to their property, including but not limited to visa processing fees, unreimbursed travel expenses, incidental relocation expenses, wage underpayments, lost employment opportunities, and/or other pecuniary losses, as well as emotional suffering.

619.  The injuries flowed directly from the Georgia RICO predicate acts which were targeted at Plaintiffs and Recruitment Class members such that Plaintiffs and Recruitment Class members were the intended victims: Plaintiffs and Recruitment Class members were the foreign workers that Defendants intentionally

defrauded for purposes of securing cheap labor in violation of immigration law.

620.   Defendants' acts and omissions giving rise to this claim showed willful misconduct, malice, fraud, wantonness, oppression, and entire want of care, giving rise to a presumption of conscious indifference to the consequences.

621.   Plaintiffs and other Recruitment Class members are entitled to damages in an amount to be determined at trial, including but not limited to:

   a. compensation for their injuries to their property;

   b. punitive damages;

   c. trebling of the damages set forth in subparagraph (a) and (b), *supra*; and

   d. attorneys' and experts' fees and costs associated with this action, as authorized by O.C.G.A. § 16-14-6(c).

### COUNT IV
**Violation of 42 U.S.C. § 1981**
**Class Claim**
***All Plaintiffs against SL Alabama and SPJ***

622.   Plaintiffs and the Class Members reallege and incorporate all preceding paragraphs as if set forth fully herein.

623.   This Count sets forth claims for damages arising out of the Discrimination Class members' 42 U.S.C. § 1981 claims against Defendants.

624.   Plaintiffs and the Class Members were at all times relevant to this Complaint, parties to contracts, including contracts for the performance of work, in

which Plaintiffs and the Class Members were compensated by Defendants for work.

625.   Plaintiffs and the Class Members performed their contractual obligations.

626.   Plaintiffs and the Class Members are Hispanic or Latino and of Hispanic or Latino ancestry.

627.   Plaintiffs and the Class Members are citizens of Mexico and not citizens of the United States.

628.   Plaintiffs and the Class Members were subjected to disparate treatment discrimination on the basis of their race, non-white Hispanic or Latino, and based on their alienage by, among other things, being paid less for performing the same work as white and American employees of Defendants and being forced to work overtime and more hours per week than those non-Hispanic (white and black) and non-U.S. citizen employees.

629.   The above-pled discriminatory conduct toward Plaintiffs and the Class Members constitutes unlawful race discrimination against them in violation of 42 U.S.C. § 1981.

630.   Defendants undertook their conduct intentionally and maliciously with respect to Plaintiffs and the Subclass Members and their federally protected rights, or additionally, and in the alternative, undertook their conduct recklessly with

respect to the Plaintiffs and the Class Members and their federally protected rights, entitling them to recover punitive damages against Defendants.

631.   As a direct and proximate result of Defendants' unlawful actions, Plaintiffs and the Class Members have suffered lost compensation and other benefits of employment, pain and suffering in the form of emotional distress, inconvenience, humiliation, and other indignities.

632.   Plaintiffs and the Class Members are entitled to damages, including back pay and lost benefits, promotion or a higher rate of pay, compensatory damages, punitive damages, attorney's fees and costs of litigation pursuant to 42 U.S.C. § 1988, and all other relief recoverable under 42 U.S.C. § 1981.

**<u>COUNT V</u>**
**Fair Labor Standards Act Violations**
**Collective Action Claim**
***All Plaintiffs against All Defendants***

633.   Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

634.   Plaintiffs consent in writing to become party Plaintiffs in this action for claims under the FLSA. (Exhibit 23).

635.   This count sets forth a claim by Plaintiffs, and by all similarly situated workers who opt into this action pursuant to 29 U.S.C. § 216(b), for damages resulting from Defendants' violations of the FLSA.

636.   Plaintiffs and other TN visa holders regularly worked more than 40 hours in a single work week.

637.   Defendants' failure to pay one-and-one-half times Plaintiffs' regular rate of pay for hours above 40 in a work week violated the overtime provisions of the FLSA, 29 U.S.C. § 207(a), and its implementing regulations.

638.   Additionally, Defendants' failure to pay Plaintiffs and other TN visa workers in some work weeks at least the minimum wage of $7.25 per hour, violated the minimum wage provisions of the FLSA, 29 U.S.C. § 206(a), and its implementing regulations.

639.   Defendants' violations of the FLSA were willful in that they were aware of their obligations regarding overtime and/or minimum wages, showed reckless disregard for whether their conduct violated the FLSA, or acted without a reasonable basis to believe their actions were in compliance with the FLSA.

640.   Plaintiffs and the other similarly situated TN visa holders are entitled to their unpaid wages, plus an additional equal amount in liquidated damages, as a consequence of Defendant's unlawful actions and omissions, in accordance with 29 U.S.C. § 216(b).

641.   Plaintiffs and the other TN visa holders are also entitled to costs of Court, pursuant to 29 U.S.C. § 216(b).

642.   Plaintiff and the other TN visa holders also seek, and are entitled to, the attorneys' fees incurred by their counsel, pursuant to 29 U.S.C. § 216(b).

**COUNT VI**
**Breach of Contract under Alabama State Law**
**Class Claim**
*All Plaintiffs Against Defendant SL Alabama*

643.   Plaintiffs reallege and incorporate by reference the foregoing allegations as if set forth fully here.

644.   This count sets forth a claim by Plaintiffs and other Recruitment Class members for damages resulting from breach of contract by Defendants SL Alabama.

645.   The parties entered into a written contract.

646.   Defendant SL Alabama made written offers of employment to Plaintiffs and the Recruitment Class Members in the offer letters and in the Support Letters which contained material terms of their employment, including that these jobs would be highly skilled engineer positions paying a certain rate of pay which would be eligible for the TN visa.

647.   Plaintiffs and the Recruitment Class Members accepted the material terms of employment offered by Defendants in the offer letters and in the Support Letters and forbore other opportunities of employment and undertook certain expenses in exchange for that employment as offered.

648.   Defendant breached the contracts by failing to provide the employment

137

to Plaintiffs and the Recruitment Class Members as offered, but rather, provided manual labor jobs on its production line which were not eligible for TN visas, and for discriminatory wages that were lower than the wage promised in the Support Letters.

649.  As a result, Plaintiffs and other Recruitment Class Members incurred incidental and consequential damages which they are entitled to recover at law, including but not limited to visa processing fees, unreimbursed travel expenses, relocation expenses, wage underpayments, and lost employment opportunities, and nominal damages.

650.  Plaintiffs and other Recruitment Class Members also are entitled to recover nominal damages for Defendants' breach of these contracts.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, demand a trial by jury on all triable issues and seeks judgment as follows:

a.      assuming jurisdiction over this action;

b.      certifying this case as a class action under Fed. R. Civ. P. 23, naming Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as counsel for the Classes;

c.   declaring this action to be maintainable as a FLSA collective action pursuant to 29 U.S.C. § 216, allowing Plaintiffs to provide notice of this action to potential opt-in plaintiffs, and allowing those eligible TN visa holders who choose to do so to opt into this action;

d.   declaring that Defendants violated federal and Georgia RICO and the TVPA;

e.   declaring Defendants SL Alabama and SPJ violated Section 1981;

f.   declaring Defendants violated the FLSA;

g.   declaring Defendant SL Alabama breached contracts of employment with Plaintiffs and applicable Class members;

h.   permanently enjoining Defendants from further violations of the federal and Georgia RICO and the TVPA;

i.   permanently enjoining Defendants from further violations of Section 1981 and the FLSA;

j.   granting judgment to Plaintiffs and other Recruitment Class members, and against all Defendants, on Plaintiffs' and other Recruitment Class members' federal RICO claims and awarding them the trebled amount of their pecuniary losses;

k.    granting judgment to Plaintiffs and other Class members for Plaintiffs' and other class members' TVPA claims and awarding them compensatory and punitive damages;

l.    granting judgment to Plaintiffs and other Recruitment Class members, and against all Defendants, on Plaintiffs' and other Recruitment Class members' Georgia RICO claims and awarding them the trebled amount of their pecuniary losses and punitive damages;

m.    granting judgment to Plaintiffs and other Recruitment Class members, and against all Defendants, on Plaintiffs' and other Recruitment Class members' Georgia contract claims and awarding them compensatory and punitive damages;

n.    granting judgment to Plaintiffs and other Discrimination Subclass members, and against Defendants SL Alabama and SPJ, pursuant to Section 1981 and awarding punitive damages;

o.    granting judgment to Plaintiffs and other similarly situated TN visa holders who opt in pursuant to 29 U.S.C. § 216(b) on their FLSA claims, and against Defendants, and awarding each of them their unpaid wages plus an equal amount in liquidated damages;

p.      Awarding Plaintiffs and other Class members prejudgment and post-judgment interest as allowed by law;

q.      Awarding Plaintiffs and other Class members their costs and reasonable attorneys' fees; and

r.      Granting such further relief as the Court finds just.

## **JURY DEMAND**

Plaintiffs, individually and on behalf of the Class, hereby demand a trial by jury as to all issues so triable.

Respectfully submitted this day: October 25, 2023.

*/s/ Rachel Berlin Benjamin*
Rachel Berlin Benjamin
Georgia Bar No. 707419
Brian J. Sutherland
Georgia Bar No. 105408
BEAL SUTHERLAND BERLIN & BROWN LLC
945 East Paces Ferry Rd. NE, Suite 2000
Atlanta, GA 30326
(404) 476-5305

Daniel Werner
Georgia Bar No. 422070
dwerner@radfordscott.com
James Radford
Georgia Bar No. 108007
jradford@radfordscott.com
RADFORD SCOTT, LLP
315 W. Ponce de Leon Ave., Suite 1080
Decatur, Georgia 30030
(678) 271-0300

Christopher B. Hall
Georgia Bar No. 318380
HALL & LAMPROS, LLP
300 Galleria Parkway, Suite 300
Atlanta, GA 30339
Telephone: (404) 876-8100
Facsimile: (404) 876-3477
chall@hallandlampros.com

*Attorneys for Plaintiffs*